BUSH TERMINAL BUILDINGS COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 6806. Promulgated September 20, 1946.

*Holt S. McKinney, Esq.*, for the petitioner.
*Wm. A. Schmitt, Esq.*, for the respondent.

OPINION.

*Bond Purchase Issue.*

KERN, *Judge*: The first issue presented is whether respondent is in error in increasing petitioner's taxable income for 1940 by $242,790.36 representing the difference between the face value ($681,000) of its own bonds purchased during that year by petitioner on the open market and the amount paid for them ($412,502.50) plus unamortized discount ($25,707.14).

The Revenue Act of 1939 added section 22 (b) (9) to the Internal Revenue Code. It excluded from taxation the income of a corporation attributable to the discharge of any indebtedness evidenced by a security, if "it is established to the satisfaction of the Commissioner * * * that at the time of such discharge the taxpayer was in an unsound financial condition" and if the taxpayer filed a consent

to certain regulations authorizing an adjustment to bases, which consent was filed by this taxpayer.

It is the contention of the respondent that petitioner did not establish to the satisfaction of the Commissioner and has not shown in this proceeding that it was, in 1940, in an unsound financial condition; and that it is not, therefore, entitled to the benefit of the exclusion provided for in section 22 (b) (9).

Petitioner urges that it is not required to show that it was in an unsound financial condition, since section 22 (b) (9) was amended by the Revenue Act of 1942, eliminating that requirement in such language as to be retroactively applicable to 1940, the tax year involved here. It further contends that even if its construction of the statute is incorrect, it has met the requirements imposed by the Revenue Act of 1939 with proof of financial unsoundness and is not, therefore, taxable on the amount in dispute.

This requires an interpretation of the Revenue Act of 1942 to determine whether its terms are available to petitioner in this proceeding.

The Revenue Act of 1942 provided in its first section, numbered 101, that: "Except as otherwise expressly provided, the amendments made by this title shall be applicable only with respect to taxable years beginning after December 31, 1941."

Section 114 of the same act amends section 22 (b) (9) of the code in two particulars: By omitting the requirement of establishing unsound financial condition and by omitting the requirement that the security evidencing the indebtedness so discharged shall have been in existence on June 1, 1939.

These were the only two amendments made to section 22 (b) (9) of the code, and they may best be illustrated by the following copy of section 22 (b) (9) as it was before the 1942 amendment and as it was after the amendment, the eliminated portions being italicized here for demonstration purposes, with the changed date at the end in brackets.

(9) INCOME FROM DISCHARGE OF INDEBTEDNESS.—In the case of a corporation, the amount of any income of the taxpayer attributable to the discharge, within the taxable year, of any indebtedness of the taxpayer or for which the taxpayer is liable evidenced by a security (as hereinafter in this paragraph defined) if

(A) *it is established to the satisfaction of the Commissioner, or*

(B) *it is certified to the Commissioner by any Federal agency authorized to make loans on behalf of the United States to such corporation or by any Federal agency authorized to exercise regulatory power over such corporation,*

*that at the time of such discharge the taxpayer was in an unsound financial condition, and if* the taxpayer makes and files at the time of filing the return, in such manner as the Commissioner, with the approval of the Secretary, by regulations prescribes, its consent to the regulations prescribed, under section 113 (b)

(3) then in effect. In such case the amount of any income of the taxpayer attributable to any unamortized premium (computed as of the first day of the taxable year in which such discharge occurred) with respect to such indebtedness shall not be included in gross income and the amount of the deduction attributable to any unamortized discount (computed as of the first day of the taxable year in which such discharge occurred) with respect to such indebtedness shall not be allowed as a deduction. As used in this paragraph the term "security" means any bond, debenture, note, or certificate, or other evidence of indebtedness, issued by any corporation, *in existence on June 1, 1939.* This paragraph shall not apply to any discharge occurring before the date of the enactment of the Revenue Act of 1939, or in a taxable year beginning after December 31, 1942 [1946].

The amendments are thus clearly shown to consist wholly of eliminations, except for the extension of the date at the end. These are the amendments which section 101 of the Revenue Act of 1942 provided should be effective only after December 31, 1941, unless otherwise expressly provided. Therefore, unless otherwise expressly provided, in a taxable year prior to December 31, 1941, it was necessary to establish, or have certified by appropriate Federal agencies, the corporation's unsound financial condition, and it was necessary that the security evidencing the indebtedness so discharged have been in existence on June 1, 1939. For taxable years after December 31, 1941, neither condition was required, by reason of the amendments of 1942.

Petitioner argues strenuously that the fact that the Revenue Act of 1942 retained the language of the 1939 Act to the effect that the paragraph should not apply to any discharge occurring before the date of the enactment of the Revenue Act of 1939 could only mean an intention on the part of Congress that the amendments should be retroactively applicable to discharges which took place after the date of the enactment of the Revenue Act of 1939. It argues that retention of this language constitutes an "express provision otherwise" such as section 101 refers to.

We think it falls short of that result.

We must keep in mind that section 114 of the Revenue Act of 1942 is not a new section. It amends an existing section of the code, section 22 (b) (9). The "paragraph" referred to is section 22 (b) (9) of the code, which originated with the Revenue Act of 1939 and provided that it should not apply to any discharge which had taken place prior to the effective date of that act. The paragraph was amended in 1942, but it was still the same paragraph, section 22 (b) (9), of the code, and it still provided that it should not apply to any discharges which took place prior to the first enactment on the subject, and, as to the amendments first contained in the 1942 Act, it should not be applicable to any years prior to the effective date of the 1942 Act. These separate provisions, read together, do not lead to any confusion or conflict, but

indicate the consistent policy of Congress that the new provisions, in each case, not be retroactively applied to situations which arose before the passage of the legislation.

It is interesting to observe the method which Congress chose to indicate its intention to "otherwise expressly provide" for retroactivity of other sections of the 1942 Act. Section 22 (b) (10) was added to the code by section 114 (b) of the 1942 Act, and in section 114 (c), this explicit direction is found: "The amendment made by subsection (b) shall be applicable to taxable years beginning after December 31, 1939." Section 116 (b) of the same act states:

(b) *Effective Date of Amendments Under the Internal Revenue Code.*—The amendments made by this section shall be applicable with respect to taxable years beginning after December 31, 1938.

And by way of providing even greater retroactivity, subsection (c) of section 116 states:

(c) UNDER PRIOR REVENUE ACTS.—For the purposes of the Revenue Act of 1938 or any prior revenue Act, the amendments made to the Internal Revenue Code by subsection (a) of this section shall be effective as if they were a part of each such revenue Act of the date of its enactment.

Similarly express provision for retroactivity appears in section 118 (c), section 121 (d) and (e), section 124 (d), section 132 (e), section 137 (b), section 142 (d), section 146 (b), section 153 (e), and in numerous other sections of the same statute, and in each case, in concise, unequivocal, and unmistakable language, leaving nothing to inference or indirection. The declaration of Congress in section 101 that it would "expressly otherwise provide" for the intended exceptions to the rule there announced that the amendments should be applicable only with respect to taxable years beginning after December 31, 1941, was advisedly made and consistently followed by it throughout the act. The fact that it made no such express provision applying to the amendment contained in section 114 (a) indicates its intention that such amendments not be excepted from the rule stated in section 101.

This intention is further expressed by the report of the Senate Finance Committee on section 114 (a) of the Revenue Act of 1942, found in 1942–2 C. B. 504, 564:

Sec. 22 (b)(9) as amended will not apply retroactively and will be applicable only to taxable years beginning after December 31, 1941, and before January 1, 1946. * * *

We think section 29.22 (b) (9)–1 of Regulations 111 correctly interpreted the amendments to apply only to taxable years beginning after December 31, 1941.

It is our conclusion, therefore, that that provision of section 22 (b) (9) of the code, before the 1942 amendment, required petitioner to establish the unsoundness of its financial condition in 1940.

Proceeding, then, to petitioner's contention that it has sufficiently established its unsoundness in 1940, we must realize that the phrase "unsound financial conditions" was not defined by Congress, nor has any attempt been made by the courts or by the Commissioner in his regulations to delineate in any exhaustive detail all of its implications. It is a broad term, and the regulations recognize what is logically inferred from the language appearing in the reports of the congressional committees, that it is to be liberally, rather than strictly, construed. Regulations 103, section 19.22 (b) (9)–1, provides in part, that:

A corporation may be in an unsound financial condition, within the meaning of section 22 (b) (9) and this section, even though the fair market value of its assets exceed its liabilities or it is able to meet its current liabilities as they mature. Thus, highly indicative (but not conclusive) of an unsound financial condition would be the fact that bonds of the taxpayer are selling in a free market at prices substantially below their issue price and below the market price of similar issues of similar businesses.

The Ways and Means Committee report (H. Rept. 855, 76th Cong., 1st sess., pp. 23–24) says:

It is not necessary, for the purposes of section 215 (section 22 (b) (9) of the Code) that a corporation must establish that its liabilities exceed its assets or it is unable to meet its current obligations as they fall due.

Looking, then, to the facts before us, first, relating to the bonded indebtedness of petitioner, we find there was outstanding as of January 1, 1940, $7,561,000 principal amount of first mortgage 5 per cent sinking fund bonds. They were listed on the New York Stock Exchange and sold during 1940 at prices ranging from $461.25 to $690 per $1,000 of face value. They had sold at the following average prices during the years 1931 through 1940:

| | |
|---|---|
| 1931 | 923¾ |
| 1932 | 676¼ |
| 1933 | 417½ |
| 1934 | 496⅞ |
| 1935 | 617½ |
| 1936 | 590 |
| 1937 | 632½ |
| 1938 | 481¼ |
| 1939 | 535 |
| 1940 | 575½ |

The fixed assets of the corporation mortgaged to secure the payment of these bonds totaled approximately $13,000,000 in book value during 1940.

There is evidence that first mortgage 4 per cent bonds of Terminal sold in 1940 for a high of 70⅞ and a low of 65¼, and consolidated mortgage 5 per cent bonds of Terminal sold for a high of 47 and a low of 32⅛ in 1940, but we have no basis for a comparison of these issues with the bonds of petitioner which are the subject of this inquiry, beyond the facts disclosed by the descriptions of the bonds themselves, as set out above. There is also some evidence that first mortgage 4 per cent bonds of the New York Dock Co. sold in 1940 at a high of 61⅝ and a low of 46½, but this information suffers also from the disability above mentioned.

Interest on petitioner's bonds has been paid when due.

Under the terms of the first mortgage securing the payment of these bonds, petitioner was required to make certain payments on November 1 of each year into a sinking fund, which payments it had made until 1935. Under plan of reorganization adopted and approved by the court in 1937 in connection with the 77–B proceedings, a supplemental mortgage was executed which extended until April 1, 1940, the due dates of the sinking fund installments due as of November 1 in each of the years 1935, 1936, 1937, 1938, and 1939 and provided for interest at 5 per cent from the respective due dates on the installments, which were in the amount of $198,000 each. The supplemental mortgage provided that such deferred installments should be due April 1, 1940, but only to the extent of 80 per cent of petitioner's net income for the period January 1, 1937, to December 31, 1939, computed as therein described, with credit to be given for amounts expended for additions and betterments. Provision was made, also, for the pledge, by petitioner, of all, except qualifying shares, of the outstanding stock of Bush House, Ltd. It was provided that bonds might be delivered to the trustee under the mortgage, to be credited at their cost price to petitioner.

Petitioner was not obligated to pay the deferred sinking fund installments on April 1, 1940, since it had no net income for the period 1937–1939 as defined by the supplemental mortgage.

On April 1, 1940, the deferred installments, with interest, totaled $1,097,250. A current installment of $231,000 became due in November of 1940 and was paid. Petitioner's computation of the amounts due and payable as sinking fund installments includes this November installment and also the one due in November of 1941, as a part of its contention that petitioner was not able to meet its obligations on April 1, 1940, and was therefore in an unsound financial condition. This it does on the authority of *Southeastern Building Corporation*, 3 T. C. 381; affd., 148 Fed. (2d) 879, where obligations falling due within one year of the critical date were considered. In that

case, however, unlike the instant one, the taxpayer had received all its income for the entire ensuing year, and it was necessary to make provision from that income for all obligations becoming due within the year. We do not have that situation here, where petitioner continued to have earnings coming in with which to meet future obligations. For that reason, we do not think such future obligations are includible in such a computation as these facts require.

As of December 31, 1939, petitioner had available quick assets, in excess of current liabilities, of $570,945.71. It had on hand on the same day bonds which it had repurchased for $432,045.

During 1940 it repurchased a principal amount of $681,000 of the bonds at a cost of $438,209.64, which was 64 plus per cent of their face value. The balance sheet indicates that $356,000 (face value) was redeemed, and $325,000 was held in the treasury. Of these amounts, $184,000 face value was bought before April 1, 1940. If the latter bonds were purchased at the average price paid by it during the year, their cost to petitioner would be in excess of $118,000.

Petitioner contends it is entitled to a credit for improvements and betterments only for the purpose of determining whether it may pay dividends. We do not think paragraph third of the supplemental mortgage, set out in our findings, may properly be construed so narrowly. However, the amount of any such credit available to petitioner has not been established here.

We are unable to view the situation of April 1, 1940, through petitioner's statistical dark glasses. In the first place, petitioner was under no obligation to pay any deferred sinking fund installments on April 1, 1940, and did not do so. In the second place, even if petitioner had been so obligated, which it was not, its net quick assets as of January 1, 1940, plus the cost to it of its bonds repurchased up to April 1, 1940, were in an amount which exceeded the deferred sinking fund installments plus interest, without any credit on account of betterments. Altogether, in 1940, petitioner bought bonds far in excess of the amount required to meet the November 1, 1940, current sinking fund installment. In fact, during 1940 it bought a total of $681,000 principal amount, of which, the balance sheet discloses, it redeemed $356,000 and held $325,000 in the treasury. This action is not explained, and it does not appear from the evidence that petitioner was under any obligation to redeem any bonds otherwise than through the sinking fund. Nor is the failure to pay dividends explained.

With respect to the value of the London office building in 1940, petitioner contends that it was negligible, due to the danger of its destruction by bombing and to the imminence of a German invasion, although it was insured against war risks. However, we should have

to conclude, in order to agree with petitioner on this question, that this danger throughout the year 1940 was so great that it would affect not only the value of the London office building, but also the solvency of the British Government, which we may suppose from the meager record on this point to have been the insurer of the building against war risks. While there was a possibility that England would be invaded in 1940, it was recognized as likely only after the fall of France in May 1940, and became unlikely after the so-called Battle for Britain was won in the air in September and October of the same year. There is no testimony in the record by any expert on the market value of London office buildings during the war years; there is merely the testimony of an assistant vice president of an American bank who testified: "I don't think that insurance would have been of much value in the event of an invasion, and I don't think if the property had been offered for sale in that year it would have brought a value for which it was carried on the company's books." We are not able to conclude from the record that the market value of Bush House, the largest office building in London, was materially less when petitioner's indebtedness here in question was discharged than the figure at which it was carried on petitioner's books.

We are therefore of the opinion that petitioner's situation in 1940 was, briefly, that its bonds were selling below face value and it had paid no dividends on either preferred or common stock since 1933. It was technically still under the jurisdiction of the United States District Court in 77-B proceedings. On the other hand, it would have been able to meet its obligations to the sinking fund if any had existed, as to both principal and interest on all the deferred 1937–1939 installments, on April 1, 1940, the date upon which they would have become due pursuant to the terms of the supplemental mortgage and reorganization plan if petitioner had had net income for the period 1937–1939. It had a net worth in excess of $9,000,000, and a gross income in 1940 of $2,274,716.57. The real property which was subject to the mortgage securing the bonds was valued at more than $12,000,000, and the bonds still outstanding as of the beginning of 1940 were in the principal amount of $7,561,000 and as of the end of 1940, $6,880,000. It had, in addition, other assets carried on its books at the value of $3,869,413.

The question is whether these facts are indicative of an "unsound financial condition" within the meaning of section 22 (b) (9). This section of the statute has been interpreted in two recent decisions of this court.

*Southeastern Building Corporation, supra*, cited by petitioner, is readily distinguishable on its facts. There were outstanding bonds in the principal amount of $129,000 on property worth $54,000, the

taxpayer's only asset beside the real estate was $2,891 in cash, and its current year's rental income of $17,000. Its current expenses and short term obligations of less than one year amounted to $18,825. It had, therefore, only about $1,000 with which to purchase $9,000 par value of bonds to meet its sinking fund obligations for the current year. It bought the bonds for $6,300 and gave a note for that amount, payable the following year.

In *Twin City Rapid Transit Co.*, 3 T. C. 475, in many essential respects the facts resemble those now before us. Dividends on preferred stock were in arrears to the extent of more than a million dollars, representing dividends of 5 years. No dividends had been paid on common stock since 1930. The corporations' bonded indebtedness amounted to twenty-one million dollars, and their fixed assets were in excess of fifty-five million dollars. The series A bonds sold at an average of 59½ in the tax year and 56 during the ten years prior thereto, while the series B bonds sold generally at a few points less since their issuance in 1934. The corporations had had an operating loss the year before the tax year, and a modest profit in the tax year. They had borrowed no money since 1927, except the amount represented by the series B bonds, $64,200. The corporations had a surplus of approximately $12,000,000 and a net worth of approximately $26,000,000. They had bought new equipment at substantial cost in each year since 1936 and had reacquired, by the end of the tax year, about one-sixth of the total outstanding bonds. We held the petitioners had not established that they were in an unsound financial condition.

All of these facts are true, to a greater or lesser degree in the instant case, except that the petitioner here had had three years of operating loss before its tax year, while the taxpayers in the *Twin City* case had had only one. However, petitioner had succeeded in repurchasing almost half of its total outstanding bond issue, compared to one-sixth in the *Twin City* case, and petitioner had a much larger net worth, proportionately, so that in spite of its operating losses, petitioner appears to have been in better condition, basically, than the Twin City taxpayers.

We think the facts of this case are much more closely akin to the *Twin City* case than to *Southeastern Building Co.*, relied on by petitioner. And we reach the same conclusion here, that petitioner has not been able to establish that it was in unsound financial condition in 1940.

### Railroad Debt Issue.

At the end of 1939 petitioner carried on its books an account receivable due from the Bush Terminal Railroad Co. in the amount

of $1,614,819.98, which consisted of current charges and credits between the two corporations for various services, rentals, advances, and interest over the period from 1918 to 1939, inclusive. During 1939 litigation was instituted for the collection of the balance due to petitioner, which resulted in a compromise settlement in 1940 for $500,-000, payable $200,000 in cash and the rest in annual $25,000 installments. Petitioner then charged off the difference between $1,614,-819.98 and $500,000 on its books, but claimed no deduction for the bad debt in its return for 1940. Petitioner now claims a bad debt deduction for the difference between $1,614,819.98 and $291,125, which it contends was the fair market value in 1940 of the settlement agreement. Petitioner's evidence as to this value is uncontradicted and we have found it to be in accordance with this evidence.

Respondent contends, first, that the total indebtedness must be reduced by the amount of $290,436.57 representing interest never reported by petitioner for taxation.

Petitioner makes no contention to the contrary.

Regulations 103, section 19.23 (k)-2, provided that:

*Examples of Bad Debts.*—Worthless debts arising from unpaid wages, salaries, rents, and similar items of taxable income will not be allowed as a deduction unless the income such items represent has been included in the return of income for the year for which the deduction as a bad debt is sought to be made or for a previous year. * * *

This rule has long been applied to indebtedness for interest. *Charles A. Collins*, 1 B. T. A. 305; *District Bond Co.*, 39 B. T. A. 739.

We are therefore in accord with this adjustment contended for by respondent.

Respondent further contends that against the remainder of the loss otherwise allowable must be offset the operating losses of Railroad which were availed of by the group in consolidated returns in earlier years to reduce the net incomes of both petitioner and Terminal. If this be done, respondent's computation demonstrates that the loss deduction will be completely eliminated.

Respondent does not recognize the possibility of allocating the excess between petitioner and the parent, both of which benefited taxwise by Railroad's operating losses. He applies the entire loss of Railroad availed of by the group against petitioner's bad debt loss. Petitioner claims it is merely a creditor, and that the cases cited by respondent, applying to parent and subsidiary, have no application to petitioner, which does not and never has owned any stock of its debtor corporation; and, therefore it urges that no part of Railroad's losses should be used to reduce petitioner's bad debt deduction.

On this point respondent cites and depends upon the principle announced in *Charles Ilfeld Co.* v. *Commissioner*, 292 U. S. 62; *Greif Cooperage Corporation* v. *Commissioner*, 31 B. T. A. 374; affd., 85

Fed. (2d) 365; and *Commissioner* v. *Emerson Carey Fibre Products Co.*, 70 Fed. (2d) 990, reversing 26 B. T. A. 675.

In the first of these cases it was held that a loss sustained by a parent corporation on sale or liquidation of its investment in a subsidiary must be reduced by the amount of operating losses of the subsidiary of which the parent has had the benefit by way of consolidated returns. See also *McLaughlin* v. *Pacific Lumber Co.*, 293 U. S. 351; *National Casket Co.* v. *Commissioner*, 78 Fed. (2d) 941.

None of the authorities cited by either party controls the solution of the question presented by the facts in the instant case. Here one of the subsidiary corporations of a parent corporation had operating losses for many years which were availed of in consolidated returns of an affiliated group, of which petitioner was also a subsidiary, for the purpose of offsetting taxable income of both the parent corporation and petitioner, thus reducing the taxable income of the group. Petitioner through the years became a creditor of the other subsidiary in a large amount. Some seven years after the affiliated group ceased filing consolidated returns petitioner charged off the larger part of this debt as a bad debt. At that time the debtor corporation was still a wholly owned subsidiary of the parent corporation, which continued to own all of petitioner's common stock.

Under these circumstances, may the petitioner's bad debt loss be reduced by the operating losses of the debtor-subsidiary, or any part of them?

The only cases which have come to our attention which involve facts in which the operating losses of one subsidiary have been availed of in consolidated returns to reduce the taxable income of another subsidiary are *Greif Cooperage Corporation* v. *Commissioner*, *supra*, and *Commissioner* v. *Emerson Carey Fibre Products Co.*, *supra*. Except for these two, the cases on the general subject are those in which the operating losses of a subsidiary were availed of to reduce the taxable income of the parent. See *Edward Katzinger*, 44 B. T. A. 533; affd., 129 Fed. (2d) 74.

In the *Greif Cooperage Corporation* case, we held that, in computing the deductible loss sustained by a parent corporation from the liquidation of a wholly owned subsidiary, adjustment must be made for operating losses of the subsidiary availed of by members of an affiliated group in reducing their taxable income during the period of affiliation for which consolidated returns were filed, even though, during that period, the parent corporation's individual net income was negligible. We said:

If the net losses of the Sandpeeco Veneer Co. and of the Tuscaloosa Cooperage Co. [two subsidiaries of petitioner] had been applied directly against the net incomes of the petitioner for prior years for which it filed consolidated returns there could be no question but that the deductible loss should be reduced by the

operating losses of the two companies above named. *Burnet* v. *Riggs National Bank, supra; Commissioner* v. *Apartment Corporation*, 67 Fed. (2d) 3; *Summerfield Co.*, 29 B. T. A. 77; *National Casket Co.*, 29 B. T. A. 139; *W. M. Ritter Lumber Co., supra; Ilfeld Co.* v. *Hernandez, supra; Walker Products Corporation, supra.*

The question here is whether a different rule should obtain where the operating losses of the liquidated subsidiaries have been applied not against the net incomes of the petitioner corporation, but against the net incomes of other subsidiaries. The question in any event is the actual loss which was sustained by the petitioner from the liquidation of the two subsidiaries. If the liquidating losses should be reduced by the operating losses availed of by the parent corporation in reduction of its own net incomes in prior years, we think that they should be reduced by the operating losses which have been availed of in the reduction of the net incomes of other subsidiaries in prior years. In either event the benefit of offsetting net incomes by the operating losses redounded to the parent corporation—in the one case directly and in the other indirectly. * * *

In that case it should be noted that no loss deduction was claimed by another subsidiary on account of a bad debt owed to it by either of the liquidated subsidiaries; the only deduction considered was that which was claimed upon liquidation of the subsidiaries having operating losses by the parent and arising by reason of the parent's investment in those subsidiaries.

In *Commissioner* v. *Emerson Carey Fibre Products Co., supra,* three affiliated corporations whose stock was owned by one family filed consolidated returns during the years 1917 to 1923. One of the affiliates had operating losses during each of these years which were availed of to reduce the taxable income of the other two. In 1923 the unprofitable affiliate was liquidated. At that time it owed to one of the profitable affiliates a net uncollectible amount slightly less than the total of its operating losses reported in the consolidated returns. It was held that no deduction could be taken by the creditor affiliate in 1923 on account of a bad debt, since the debt was less than the amount of the operating losses of the debtor affiliate availed of in the consolidated returns. It should be noted that in its short opinion in this case the court made no reference to the applicability of any operating losses of the unprofitable subsidiary to a reduction of a loss to the owner upon its liquidation during the same taxable year. This question, it would seem, was never presented.

Thus, in one of the two cases which we have discussed all of the operating losses of an affiliated subsidiary were used to reduce the loss of the parent corporation upon liquidation of the affiliate, with no question there present of a reduction of a bad debt loss of another affiliate having taxable income which was reduced during the consolidated return period by the operating losses of the debtor affiliate; and in the other a bad debt loss of the creditor affiliate was reduced by the operating losses of the debtor affiliate, with no question being raised as

to the use of these operating losses to reduce the loss of the parent corporation (or its equivalent) upon liquidation of the debtor affiliate.

From 1928 through the tax year here involved the regulations of respondent have contained provisions which purport to be applicable to the general situation before us.

The pertinent articles of Regulations 78, which are in all material respects the same as those in other regulations applicable to the years 1928 to 1940, inclusive, are set out in the margin.[1]

---

[1] ART. 40. Bad Debts.

(a) *Resulting From Transactions During Consolidated Return Period.*

Intercompany accounts receivable or other obligations which are the result of intercompany transactions during a consolidated return period shall not be deducted as bad debts during a consolidated return period.

(b) *Resulting From Transactions Prior to Consolidated Return Period.*

No deduction shall be allowed during a consolidated return period for intercompany accounts receivable or other obligations resulting from intercompany transactions during the period for which separate returns were made.

(c) *Limitation on Allowance After Consolidated Return Period.*

The rules applicable to the allowance of losses upon the sale of bonds shall be applicable to the allowance after the consolidated return period as a bad debt of an intercompany account receivable or other obligation resulting from an intercompany transaction during the consolidated return period. (See article 35.)

ART. 35. Sale of Bonds—Basis for Determining Gain or Loss.

In the case of a sale or other disposition by a corporation, which is (or has been) a member of an affiliated group which makes (or has made) a consolidated return for the taxable year 1929 or any subsequent taxable year, of bonds issued by another member of such group (whether or not issued while it was a member of the group and whether issued before, during, or after the taxable year 1929), the basis of each bond, for determining the gain or loss upon such sale or other disposition, shall be determined in accordance with the Act (see, particularly, section 113 of the Act), but the amount of any loss otherwise allowable shall be decreased by the excess (if any) of the aggregate of the deductions computed under paragraphs (c) (2) and (e) of article 34 over the sum of the aggregate bases of the stock of the issuing corporation as computed under paragraph (c) (1) or (d), as the case may be, held by the members of the affiliated group. (See, also, article 40 (c), relating to disallowance of loss upon intercompany bad debts.)

ART. 34. Sale of Stock—Basis for Determining Gain or Loss.

    *        *        *        *        *        *        *

(c) *Sales Which Break Affiliation Made While Selling Corporation is Member of Group.*

If the sale is made during a period during which the selling corporation is a member of the affiliated group (whether or not during a consolidated return period), and if, as a result of such sale, the issuing corporation ceases to be a member of the affiliated group, such basis shall be determined as follows:

(1) The aggregate basis of all shares of stock of the issuing corporation held by each member of the group (exclusive of the issuing corporation) immediately prior to the sale, shall be determined separately for each member of the group, and adjusted in accordance with the Act (see sections 111 to 115, inclusive, of the Act) ;

(2) From the sum of the aggregate bases, as determined in paragraph (1), there shall be deducted the sum of the losses of such issuing corporation sustained during each of the consolidated return periods (including only the taxable year 1929 and subsequent taxable years) after such corporation became a member of the group and prior to the sale of the stock, to the extent that such losses could not have been availed of by such corporation as a net loss in computing its tax for such periods if it had made a separate return for each of such periods ;

    *        *        *        *        *        *        *

(d) *Sales After Selling Corporation Has Ceased To Be Member of Group.*

If the sale is made after the selling corporation has ceased to be a member of the affiliated group, such basis shall be determined in accordance with paragraph (c) of this article, except that—

(1) The aggregate basis (under paragraph (c) (1)) shall be determined for all shares of the issuing corporation held by each member of the group immediately prior to the time

While we do not minimize the difficulty of interpreting respondent's regulations, we are of the opinion that they sanction and require the application of those operating losses of one affiliated corporation availed of in consolidated returns in reducing the taxable income of another affiliate to a reduction of a bad debt loss claimed by the latter affiliate on account of an uncollectible debt owed to it by the affiliate having the operating losses, regardless of whether the creditor affiliate is the parent corporation or a fellow subsidiary of the debtor affiliate.

In considering these regulations we have not ignored the contentions of petitioner that certain provisions of article 34 are inconsistent with applying the regulations to the instant case. Our answer is that, in order to make the provisions of articles 40, 35, and 34 intelligible, they must be read together and that the provisions of articles 35 and 34, when considered in reference to the subject matter of article 40, must be construed in the light of the latter's subject, as distinguished from their own subjects. For example, petitioner points out that article 34 (c) (1) and (2) refers to sales of stock "which break affiliation made while selling corporation is member of group," and, therefore, contends that none of the regulations which we have quoted can be effective unless and until the parent corporation has sold the stock of the affiliate having the operating losses in question, and until such sale the allowance of petitioner's bad debt deduction can not be adjusted in any manner by such operating losses. It is our opinion that this contention is erroneous in that article 34 is referred to by article 35 not for the purpose of ascertaining *when* the "excess" partially defined in article 35 shall exist for purposes of computation, but for the purpose of ascertaining *how* it shall be computed. It is further our opinion that when article 34 (1) and (2) is read in connection with article 40 and the latter's subject matter, as directed by the regulations, we must construe the words "immediately prior to the sale" and "prior to the sale of the stock" as equivalent

the selling corporation ceased to be a member of the group (rather than immediately prior to the sale) ;

(2) The allocations (under paragraph (c) (3)) shall be made to each member of the group which held stock of the issuing corporation immediately prior to the time the selling corporation ceased to be a member of the group (rather than to the members holding such stock at the time of the sale) ; and

(3) The basis of each share of stock held by the selling corporation (determined, as above, as of the time the selling corporation ceased to be a member of the group) shall then be adjusted in accordance with the Act (see, particularly, sections 111 to 115, inclusive, of the Act) in order to determine the basis at the time of the sale.

(e) *Limitation on Adjustment for Losses.*

In the event of a consolidated net loss which was sustained for any year prior to the taxable year during which the sale was made and which was not availed of by the members of the affiliated group in computing the tax for any consolidated return period, the adjustment under paragraph (c) (2) of this article shall be reduced by an amount equal to that proportion of such net loss which the net loss of the issuing corporation for the year in which such net loss was sustained bears to the aggregate net losses of the members of the group.

to the words "immediately prior to the time when the debt became worthless for purposes of deduction." By reason of the allocation of Railroad's operating losses between petitioner and Terminal, to which we shall later refer, any loss which may be sustained by Terminal by reason of its investment in Railroad upon the latter's liquidation will be more than covered by Railroad's operating losses availed of in reducing Terminal's taxable income.

Petitioner's principal contention, that the broad doctrine of double deductions exemplified by *Charles Ilfeld Co.* v. *Commissioner, supra*, is applicable only as between subsidiary and parent corporations and is not applicable as between two affiliated subsidiaries, is not supported by any decision and is contrary to the *Emerson Carey Fibre Products Co.* case which we have already discussed, and to the regulations as we have construed them.

To sum up our conclusions reached to this point, we are of the opinion that the operating losses of Railroad availed of in consolidated returns to reduce the taxable income of petitioner must be used to reduce petitioner's deduction in 1940 on account of Railroad's bad debt.

This statement indicates that there is another question still unsolved, and that is the extent by which petitioner's taxable income during the consolidated returns period was reduced by reason of the operating losses of Railroad. The facts in this case show that during the entire period of the consolidated returns two of the affiliated corporations, petitioner and its parent, Terminal, each reported taxable income considerably in excess of the operating losses of their affiliate Railroad, and thus each of them benefited by a reduction of its taxable net income. To use the entire amount of these operating losses for the purpose of reducing the bad debt deduction of petitioner seems to us inequitable and is not required by any statute, regulation or authority. Only that part of Railroad's operating losses should be used to reduce petitioner's bad debt deduction which represents the proportion of petitioner's taxable net income to the combined taxable net income of petitioner and Terminal. In other matters embraced in the general field of consolidated returns of affiliated corporations, allocations have been made. See sec. 23.15, Regulations 104; I. T. 3637, 1944 C. B. 258; I. T. 3692, 1944 C. B. 261; *Cincinnati Mining Co.*, 8 B. T. A. 79.

### 1939 Net Operating Loss Carry-over.

Petitioner contends the item of $13,750 accrued as interest on the debt of Railroad for 1939 was properly eliminated from its income for the purpose of computing its 1939 net loss carry-over on its 1940 return. This contention seems to rest on the theory that the item was improperly accrued, and was not a proper item of income, because suit was instituted on the account in 1939 and settled in 1940 for less than

a third of the total indebtedness, and at the time litigation was commenced it was evident that the collection of the total indebtedness would be impossible. It appears to be petitioner's contention that, since the interest was so accrued on a bad debt, it was not properly income, and hence should be excluded.

The contentions of the parties on this issue are not clear. It is difficult for us to see how a contention can be made by the petitioner on this issue which will be consistent with its treatment of these interest items under the second issue, which has to do with the bad debt deduction. In 1939 petitioner accrued as income the sum of $13,750 as interest on its account against Railroad and this account was thereby increased by this amount. For the taxable year 1940 it claims a deduction as a bad debt of the entire amount of its account against Railroad, less a cash settlement and the value of an undertaking to make deferred payments. Thus, it is seeking to deduct as a bad debt the amount of this interest item. As we have already pointed out, in order for this interest item to be thus deductible it must have been included in income, as it was. For the petitioner to contend now as to the issue of a net operating loss carry-over that this interest item was improperly accrued and was not a proper item of income is not only inconsistent with its own treatment of this item on its books in 1939, but is also inconsistent with any deduction of it as a bad debt or part of a bad debt. If we should accord validity to petitioner's positions on both these issues, it would result in effect in a double deduction.

We have already decided that petitioner may deduct as a bad debt its account against Railroad, including therein this interest item, with certain adjustments explained in detail in our discussion under the last issue. We find nothing in the record which would also justify elimination of this item from petitioner's income in computing its 1939 net loss carry-over.

### Reorganization Expenses.

Petitioner incurred certain expenses during 1939 and 1940 in connection with its reorganization, and it charged them to an account on its books called "Reserve for reorganization expenses." The account consisted of numerous items, including substantial legal, accounting, and other professional fees relating to or growing out of the reorganization. That they were expenditures connected with the corporate reorganization is admitted; that petitioner originally regarded them as capital items is indicated by the fact that petitioner charged them on its books to a "reserve for reorganization expenses" and did not deduct them in its tax returns for the years involved.

We have held over a long period of time that expenses of organizing or reorganizing corporations are capital expenditures which are not

deductible as business expenses. *First National Bank of St. Louis*, 3 B. T. A. 807; *Hershey Manufacturing Co.*, 14 B. T. A. 867; *Udolfo Wolfe Co.*, 15 B. T. A. 485; *Odorono Co.*, 26 B. T. A. 1355; *Weber-Bunke-Lange Coal Co.*, 11 B. T. A. 503; *Emerson Electric Manufacturing Co.*, 3 B. T. A. 932; *Shenandoah Rayon Corporation*, 42 B. T. A. 1287, 1304.

See also *Record Realty Co.*, 6 T. C. 823, where expenses of 77-B reorganization were assumed to be capital expenditures, the question decided there being whether they were a type of capital expenditures which could be amortized by annual deductions.

Petitioner contends that the expenditures were not made for the purpose of acquiring or defending title to property, and that they can not properly be classified as capital expenditures.

The same question was argued in *Holeproof Hosiery Co.*, 11 B. T. A. 547, and we said:

Those expenses which are ordinary and necessary in carrying on a business may be deducted from annual income when paid or incurred. Expenditures which are made for the acquisition of capital assets represent the cost of the asset and, if the assets are exhausting, deductions for exhaustion make capital whole in such cases before income is taxed. * * * However, all expenditures need not fall into one or the other of these two classes. * * *

The expenditures for attorneys' fees in this case may be such an expenditure. It can be argued, and not without merit, that no capital asset is acquired when attorneys' fees are paid in connection with an increase in capitalization, but it does not follow that the payments are ordinary and necessary expenses of the year when made. It may be that the scheme of the taxing statute fails to provide for their reflection in the computation of the petitioner's tax, but in any event they are not ordinary expenses in carrying on the business during the year 1921, within the meaning of section 234 (a) (1) of the Revenue Act of 1921. * * *

Here, as there, the question before us is not whether the expenditures are or are not amortizable capital items, but rather whether they are or are not deductible business expenses. We are of the opinion that they are not so deductible.

Other issues which have been agreed upon by the parties will be considered in computations to be filed pursuant to this opinion.

*Decision will be entered under Rule 50.*