ROBERT P. WENDLAND AND DONNA C. WENDLAND, ET AL.,[1] PETITIONERS *V.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 5708–80—5712–80, 5769–80,     Filed August 23, 1982.
5771–80—5773–80, 9376–80.

[1]Cases of the following petitioners are consolidated herewith: Irwin M. Adler and Helene E. Adler, docket No. 5709–80; Brent W. Trump and Cheryl A. Trump, docket No. 5710–80; Ronald Glassman and Lenora Rae Glassman, docket No. 5711–80; Stephen L. Nemerofsky and Nina B. Nemerofsky, docket No. 5712–80; Gerald L. Gunderson and Judith C. Gunderson, docket No. 5769–80; Sherwin Ross and Marlynn Ross, docket No. 5771–80; Roman M. Wenzel and Emily A. Wenzel, docket No. 5772–80; Wilbur F. Helmus, Jr., and Patricia Helmus, docket No. 5773–80; and Russell L. Redhouse, Jr., docket No. 9376–80.

*Zayle A. Bernstein, Michael S. Feinman, Jack Stein, Sidney T. Bernstein,* and *Allan F. Meyer,* for the petitioners.
*Roger D. Osburn* and *Judy K. Hunt,* for the respondent.

STERRETT, *Judge*: By statutory notices dated March 24, 1980,[2] respondent determined deficiencies in petitioners' income taxes for the taxable years ended December 31, 1973, December 31, 1976, and December 31, 1977, as follows:

| Docket No. | Petitioner | Year | Deficiency |
|---|---|---|---|
| 5708–80 | Robert P. Wendland and Donna C. Wendland | 1973 | $9,990.00 |
| | | 1976 | 14,270.00 |
| | | 1977 | 383.00 |
| 5709–80 | Irwin M. Adler and Helene E. Adler | 1976 | 56,460.77 |
| | | 1977 | 2,753.93 |
| 5710–80 | Brent W. Trump and Cheryl A. Trump | 1976 | 21,777.00 |
| | | 1977 | 27,350.00 |
| 5711–80 | Ronald Glassman and Lenora Rae Glassman | 1976 | 37,585.00 |
| | | 1977 | 835.00 |
| 5712–80 | Stephen L. Nemerofsky and Nina B. Nemerofsky | 1976 | 34,334.13 |
| | | 1977 | 852.29 |

[2]The statutory notice in docket No. 9376–80 was dated Mar. 28, 1980.

| 5769–80 | Gerald L. Gunderson and Judith C. Gunderson | 1976 1977 | $28,556.00 1,874.00 |
|---|---|---|---|
| 5771–80 | Sherwin Ross and Marlynn Ross | 1976 1977 | 73,524.70 1,548.25 |
| 5772–80 | Roman M. Wenzel and Emily A. Wenzel | 1976 1977 | 16,218.00 598.00 |
| 5773–80 | Wilbur F. Helmus, Jr., and Patricia Helmus | 1976 1977 | 20,124.00 23,813.00 |
| 9376–80 | Russell L. Redhouse, Jr. | 1976 | 12,351.32 |

The petition of Antonio Gonzalez-Revilla, Jr., and Nair Gonzales-Revilla, docket No. 5770–80, originally was consolidated with the other petitions but was severed from the group by the granting of the oral motion to continue of June 1, 1981.

The issues for our decision are (1) whether, under section 1.612–3(b)(3), Income Tax Regs., as amended by T.D. 7523, 1978–1 C.B. 192, an advanced royalty paid on December 31, 1976, by Tennessee Coal Resources, Ltd. (hereinafter TCR), a limited partnership, is deductible in the year of payment or only in the year when the coal is sold; (2) whether the advanced royalty deduction allowable to TCR includes the amount reflected in the nonrecourse note given by TCR as well as the cash actually paid; (3) whether each petitioner may include his share of the nonrecourse note of the partnership in his basis in TCR; (4) whether TCR properly characterized a payment of $100,000 as deductible legal expenses; and (5) whether petitioners adequately substantiated miscellaneous other deductions claimed on the 1976 and 1977 tax returns of TCR and on the returns of certain individual petitioners.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and supplemental stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference.

At the time of filing their petitions herein, petitioners' legal residences were as follows:

| Petitioner | Residence |
|---|---|
| Robert P. Wendland and Donna C. Wendland | Lighthouse Point, Fla. |
| Irwin M. Adler and Helene E. Adler | Miami, Fla. |
| Brent W. Trump and Cheryl A. Trump | Pompano Beach, Fla. |
| Ronald Glassman and Lenora Rae Glassman | Plantation, Fla. |
| Stephen L. Nemerofsky and Nina B. Nemerofsky | Plantation, Fla. |
| Gerald L. Gunderson and Judith C. Gunderson | Deerfield Beach, Fla. |
| Sherwin Ross and Marlynn Ross | Miami, Fla. |
| Roman M. Wenzel and Emily A. Wenzel | Key Biscayne, Fla. |
| Wilbur F. Helmus, Jr., and Patricia Helmus | Lighthouse Point, Fla. |
| Russell L. Redhouse, Jr | Santa Clara, Calif. |

The income tax returns for the taxable years involved were filed by each of the petitioners with the Office of the Internal Revenue Service at Chamblee, Ga. In addition, on April 5, 1977, Robert P. and Donna C. Wendland filed an application for tentative refund with the Internal Revenue Service Center at Chamblee, Ga., in which they claimed a carryback from 1976 to 1973 of unused net operating loss in the amount of $33,036. Respondent's notice of deficiency in docket No. 5708–80 reflects a disallowance of this deduction.

By confidential offering memorandum dated November 12, 1976, limited partnership interests in Tennessee Coal Resources, Ltd., were offered to various investors. The offering memorandum provided that 900 units were to be sold to limited partners at a price of $1,000 per unit for a total of $900,000. Attached to the offering memorandum were the following exhibits: limited partnership agreement; coal mine description with maps; opinion of tax counsel; unexecuted nonrecourse note; coal supply agreement between Shattuck

Coal Co., et al., and Carolina Power & Light Co.; resume of Edwin Tunick, general partner; lease agreement of November 12, 1976, between Edwin Tunick and L. D. Rowlette; subscription agreement; investor questionnaire; offeree representative questionnaire; and miscellaneous newspaper clippings. To become a limited partner in TCR, each prospective investor was required to have a net worth of at least $100,000 and some portion of his annual gross income taxable at a rate of 50 percent or more.[3]

Tennessee Coal Resources, Ltd., was formed on December 30, 1976. TCR reported its income on the accrual method of accounting. Immediately following its formation, TCR received from its general partner, Edwin Tunick, an assignment of a Claiborne County, Tenn., sublease. In addition, TCR was assigned other assets by an entity entitled GSA Corp., including a coal mining agreement with John T. Walden which included a note receivable and security interest for the sale of equipment, and a coal supply agreement between a number of individuals including Shattuck Coal Co. and Carolina Power & Light Co. The closing of the acquisition of the coal mine (the sublease, coal supply agreement, and coal mining agreement) by TCR was held on December 31, 1976.

Pursuant to the confidential offering memorandum and the attached exhibits, petitioners each acquired limited partnership interests and became limited partners in TCR as follows:

| Petitioner | Payment | Date of payment | Percentage interest in TCR |
|---|---|---|---|
| Wendland | [4] $24,500 | 12/23/76 | 3.0% |
| Adler | 36,000 | 12/23/76 | 4.0 |
| Trump | 36,000 | 12/29/76 | 4.0 |
| Glassman | 30,000 | 12/29/76 | 3.2 |

---

[3] The stipulation erroneously states that investors had to have some portion of their annual gross income taxable at a rate of 30 percent or more. The actual requirement was 50 percent as set forth in the confidential offering memorandum, the subscription agreement, and the investor questionnaire.

[4] While the parties have stipulated that petitioner Robert P. Wendland paid $24,500 to TCR on Dec. 23, 1976, the evidence indicates that he purchased 24 units in the partnership, and that $24,000 was received from him by the partnership and deposited in the partnership's bank account. We cannot account for the discrepancy between the stipulated amount and the evidence.

| | | | |
|---|---|---|---|
| Nemerofsky | $18,000 | 12/06/76 | 2.0% |
| Gunderson | 18,000 | 12/23/76 | 2.0 |
| Ross | 36,000 | 12/23/76 | 4.0 |
| Wenzel | 36,000 | 12/23/76 | 4.0 |
| Helmus | 36,000 | 12/29/76 | 4.0 |
| Redhouse | 24,000 | 12/29/76 | 3.0 |

Each executed the subscription agreement, the limited partnership agreement, and the investor questionnaire prior to becoming a limited partner in TCR. A total of $900,000 was deposited in the trust account of the law firm of DiGuilian, Spellacy, Bernstein, Lyons & Sanders. The offering memorandum stated that the proceeds were expected to be used as follows:

*Use of proceeds*

Cash downpayment for mine of GSA ................. $650,000
Fixed fee for syndication of the partnership
  to general partner ...................................... 100,000
Fee to attorneys for organization, structure,
  and tax opinion to the partnership ................. 100,000
Working capital ........................................... 50,000
    Total ................................................. 900,000

### 1. Coal Leases

The sublease received by TCR contained rights to mine a number of tracts of land and property. The rights that TCR obtained under the sublease and the coal supply agreement were obtained by the lessor and transferor, L. D. Rowlette, in a series of transactions in late 1976. In negotiating for and acquiring such assets, Mr. Rowlette was acting as nominee of GSA Corp., a corporation formed and solely owned by Theodore Neckles. In one such transaction, Mr. Rowlette, as nominee of GSA Corp., agreed to purchase all of the stock and all of the assets of Shattuck Coal Co. and Big Nickel Tipple Co. (collectively referred to as Shattuck stock) from Tom N. Shattuck and Jerry Shattuck. At the time, the assets of Shattuck Coal Co. and Big Nickel Tipple Co. included the following: (1) Certain coal mining equipment; (2) certain leases and agreements for underground mining and tipple operation rights; (3) a coal supply agreement with Carolina Power & Light Co.; and (4) an operating and sales agreement with John

T. Walden. The purchase price of the Shattuck stock as set forth in the October 21, 1976, purchase agreement between the Shattucks and L. D. Rowlette, was $500,000, of which $50,000 was paid as a downpayment and $450,000 was due on or before November 23, 1976, the date for the scheduled closing of the transaction. The closing on the sale of the stock of Shattuck Coal Co. and Big Nickel Tipple Co. to L. D. Rowlette took place on December 8, 1976. Although originally scheduled for November 23, 1976, this date was extended to December 9, 1976, by an extension agreement dated November 24, 1976. Closing actually took place 1 day earlier. The extension agreement also provided that the price at closing would be raised to $550,000.

On November 12, 1976, Mr. Rowlette, as lessor, and Mr. Tunick, as lessee, entered into an agreement (hereinafter the November 12 lease agreement) permitting Mr. Tunick to mine coal on property that was to be described in "Attached Exhibit A." The "Exhibit A" referred to in the lease agreement was not attached to the lease agreement on the date that the agreement was signed. Sometime after November 12, 1976, but on or before December 31, 1976, "Exhibit A" was attached to the lease agreement. Such "Exhibit A" included two leases. One of the leases, for three tracts of land, was dated November 22, 1976, between Clearfork Mining Co., as lessor, and L. D. Rowlette, as lessee. Of those tracts, one (which included a tipple[5] for loading coal) had been leased to Shattuck Coal Co. and was one of the assets of Shattuck Coal Co. that was listed in the October 21, 1976, purchase agreement. This lease required Mr. Rowlette, as lessee, to pay a royalty to the lessor in the amount of $1 per ton of coal that was mined and removed from the leased premises, or 6 percent of the gross selling price of such coal, whichever was greater. It further required the lessee to pay a minimum royalty as rent upon the lands leased of $1,500 per month. Such minimum royalty could be recouped out of earned royalties on any coal mined within 2 years from the date of payment of such minimum royalty.

The other lease included in "Exhibit A" to the November 12 lease agreement was dated December 1, 1976, between Jencie

---

[5]A tipple is a facility for crushing and loading coal into railroad cars.

Thomas and Kizzie LaBoe, lessors, and Shattuck Coal Co., lessee. This lease represented a renegotiation of an earlier lease between the same parties. The earlier lease was one of the assets listed in the October 21, 1976, purchase agreement between the Shattucks and Mr. Rowlette. As renegotiated, the December 1, 1976, lease provided that Shattuck Coal Co. (which was owned by Mr. Rowlette pursuant to the Oct. 21, 1976, purchase agreement), as lessee, must pay each lessor $200 per month for use of the specified property plus a royalty of 5 percent of the gross truck sale price on all coal mined and sold from the leased premises.

The November 12 lease agreement between Mr. Rowlette and Mr. Tunick provided that a $2-per-ton royalty should be paid by the lessee (Mr. Tunick) to the lessor (Rowlette/GSA) for each ton of coal mined and removed from the premises. In addition, the lease agreement provided that the lessee (Tunick) must pay a prepaid royalty of $3 million, payable with $650,000 cash on or before December 31, 1976, and with the issuance of a designated nonrecourse secured promissory note on or before December 31, 1976, in the amount of $2,350,000. The lease agreement further provided that the $3 million was to be recouped out of the first 1,500,000 tons of coal mined and sold.

## 2. Coal Mining Agreement

Aside from the coal leases, among the assets assigned to TCR on December 31, 1976, by GSA Corp. was a mining agreement between Shattuck Coal Co. and John T. Walden that included a note receivable and a security interest for the sale of equipment. Under such agreement, Mr. Walden was to mine the coal for Shattuck Coal Co. at prices ranging from $15.50 to $18.50 per ton, depending on the quality of the coal and the terms of the coal supply contract with Carolina Power & Light. This mining agreement had been listed as an asset of Shattuck Coal Co. in the October 21, 1976, purchase agreement between the Shattucks and L. D. Rowlette (as nominee for GSA Corp.) and had been transferred to Mr. Rowlette pursuant thereto.

Coal mining equipment that was listed among the assets of Shattuck Coal Co. on the October 21, 1976, purchase agreement actually had been sold by Shattuck Coal Co. to Mr. Walden on the installment basis. Under the mining agree-

ment, Mr. Walden was obligated to pay a total of $75,402.64 for the equipment. The terms of payment were as follows:

The term of this sale will be five years, total sale price of equipment in schedule A of $75,402.64 at a payment schedule of $1000 per month or $.50 per ton, which ever [sic] is greater. This payment schedule will not be so inflexable [sic] so as to not account for loss of running time caused by labor disputes, uncontrollable equipment breakdown, or working conditions. These payments will begin in the month of October 1976, and continue until the principal of $75,402.64 is consumed. The equipment mentioned is known to require additional repair which costs incurred by Walden will be deducted from the principal, not to exceed $20,000.00. If Walden is unable to profitably work this equipment after diligent and workmanlike procedures have been made, the equipment ownership will return to Shattuck and previous payments paid by Walden for the equipment will be considered liquidated damages. Further, Shattuck herein assigns three leases, held by same, for the assigned royalty payment of each lease, plus $.50 per ton, deducted from the base price paid to Walden. * * *

### 3. Coal Supply Agreement

A third major asset that was assigned to TCR on December 31, 1976, by GSA Corp. was a supply agreement between Carolina Power & Light Co., purchaser, and a number of sellers including Shattack Coal Co. Such coal supply agreement with Carolina Power & Light Co. was listed as an asset of Shattuck in the October 21, 1976, purchase agreement. Under the supply agreement, Carolina Power & Light Co. agreed to pay a base price of $17.75 per ton f.o.b. railcar at the shipping point for 12,000 BTU/lbs. coal. Shattuck Coal Co. agreed to provide 50,000 tons of coal yearly at such price. Price adjustments were provided in the supply agreement based upon the quality of the coal and the costs associated with mining such coal.

All of the assets acquired by TCR pursuant to the December 31, 1976, transfer of assets were bargained for by L. D. Rowlette as nominee of GSA Corp. during negotiations for purchase of the Shattuck stock. The leases, received from Mr. Tunick, were valuable in that they provided a source of coal. The coal supply agreement with Carolina Power & Light was valuable in that it provided a market for the coal. The operating agreement with John T. Walden was valuable in that it provided a source for mining the coal. Further, some value of the operating agreement was assured in that it provided the holder would receive $75,402.64 as payment for

equipment sold pursuant thereto. The rights in the tipple were valuable because a tipple is essential to the operation of a coal mine. If the coal mine owner does not control a tipple (as most small operators do not), the miner must transport the coal to a tipple owned by someone else and pay for the use of such facility.

In part, disbursements were made from the trust account of DiGuilian, Spellacy, Bernstein, Lyons & Sanders for TCR as follows:

| Payee | Date | Amount |
|---|---|---|
| Wire transfer to United American Bank, Knoxville, Tenn ............. | Dec. 31, 1976 | $550,000.00 |
| Michael J. Padula[6] trust account ................. | Dec. 31, 1976 | 100,000.00 |
| DiGuilian, Spellacy, Bernstein ..................... | Jan. 14, 1977 | 52,000.00 |
| Edwin Tunick, general partner, TCR ...... | Jan. 14, 1977 | 50,000.00 |
| DiGuilian, Spellacy, Bernstein ..................... | Jan. 14, 1977 | 4,671.46 |
| Edwin Tunick, general partner ............. | Feb. 10, 1977 | 28,382.50 |
| DiGuilian, Spellacy, Bernstein ..................... | Feb. 10, 1977 | 28,382.50 |
| Edwin Tunick ................ | Mar. 11, 1977 | 10,167.50 |
| DiGuilian, Spellacy, Bernstein ..................... | Mar. 11, 1977 | 10,167.50 |

With respect to the $550,000 wire transfer to United American Bank, Knoxville, Tenn., such amount was used to pay the amount due from Mr. Rowlette to Tom N. Shattuck and Jerry Shattuck for their stock in Shattuck Coal Co. and Big Nickel Tipple Co. At the December 8, 1976, closing on the sale of the Shattuck stock to L. D. Rowlette (as nominee of GSA Corp.), Mr. Rowlette had given Tom N. Shattuck and Jerry Shattuck a check. This check was not honored because of insufficient funds. The Shattucks eventually received payment by cash-

---

[6]Michael J. Padula was the attorney for GSA.

ier's check from United American Bank in Knoxville, Tenn. With respect to the $100,000 disbursed to Michael J. Padula trust account, such amount was paid over to GSA.

On November 16, 1976, L. D. Rowlette entered into an agreement with GSA Corp. (GSA) wherein it was acknowledged that Mr. Rowlette had been acting as nominee-purchaser for GSA in entering into the purchase agreement with Tom N. Shattuck and Jerry Shattuck to acquire Shattuck Coal Co. and Big Nickel Tipple Co. The November 16, 1976, agreement further provided that Mr. Rowlette was to receive $50,000 as compensation for his services as nominee-purchaser of Shattuck Coal Co. for GSA. This amount was to be paid from proceeds received under the November 12, 1976, lease agreement between Mr. Rowlette and Edwin Tunick. In addition, it was provided that GSA would employ Mr. Rowlette as general manager and operating miner for mines to be operated by GSA.

On November 16, 1976, Mr. Rowlette also executed an authorization directed to Edwin Tunick and/or Zayle Bernstein (attorney for petitioners herein and a member of the law firm that helped to organize TCR and maintain a bank account on behalf of TCR) to pay all funds due under the November 12, 1976, lease agreement to the Michael J. Padula trust account as the attorney for GSA.

The amounts disbursed to Edwin Tunick, the general partner, and to the law firm of DiGuilian, Spellacy, Bernstein, Lyons & Sanders were in compensation for their services in organizing the partnership. Such expenditures were authorized in the limited partnership agreement, which provided as follows:

ARTICLE XIII

ORGANIZATION EXPENSE

The Partnership shall be responsible for all expenses incurred in connection with its organization and related matters including but not limited to legal fees, and for offering expenses not to exceed $200,000.00.

Mr. Tunick, the initial general partner of TCR, was responsible for syndication of the partnership. Mr. Tunick was a certified public accountant with a number of clients who were sophisticated investors. He was informed by a number of practitioners, including Mr. Zayle Bernstein, that tax-shel-

tered investment opportunities were available in the coal industry. Mr. Tunick was responsible for obtaining most of the investors for the TCR venture.

The specific coal mine eventually acquired by TCR was located by Mr. Bernstein. This is evidenced in article XV of the limited partnership agreement which provides for compensation to Mr. Bernstein's law firm as follows:

The Limited Partners by execution of this agreement * * * ratify, affirm and agree that said compensation to [the law firm of DiGuilian, Spellacy, Bernstein, Lyons & Sanders] * * * shall be One Dollar ($1.00) per ton of the coal mined, removed and sold by the Partnership. It is also agreed by all parties hereto that *part of said compensation is in lieu of any finders fee due for locating the mining property by the said law firm.* [Emphasis added.]

Mr. Bernstein located the coal property through Mr. Theodore Neckles, the sole owner of GSA Corp. Mr. Bernstein also introduced Mr. Tunick to L. D. Rowlette, the nominal purchaser of the coal mine for GSA, and accompanied Mr. Tunick on one trip to examine the mine prior to closing. Mr. Bernstein's firm was responsible for formulating the confidential offering memorandum and attachments, obtaining geological information, rendering a tax opinion, and preparing projections of income and expenses including sales price per ton of coal and mining costs. In addition, Mr. Bernstein helped to locate one investor.

Upon the assignment to TCR on December 31, 1976, of the November 12, 1976, lease agreement between Mr. Rowlette, as lessor, and Mr. Tunick, as lessee, TCR became responsible for all of the terms of that lease. Among the terms was a provision that an advance royalty of $3 million would be paid to the lessor, represented in part by a nonrecourse note in the amount of $2,350,000. On that same date, TCR delivered a nonrecourse note in the amount of $2,350,000 to Mr. Rowlette, who then assigned the note to GSA Corp. The note provided for payment of interest at the rate of 4 percent per annum on the balance of principal remaining until December 15, 1987. Under the terms of the note, the provision respecting payment was as follows:

The undersigned [TCR] covenants and agrees that cash actually received by the undersigned from the * * * [mine lease] to which the undersigned shall be entitled shall be applied in satisfaction of the principal obligation evidenced by this Note, together with the accrued interest thereon, if any, by

multiplying $1.91 for each ton of coal mined, removed and sold from the Prospect by the fractional percentage interest of the undersigned, as indicated below, in the [mine lease] * * *

However, the promissory note went on to require payment on the principal of the note only if cash were available after payment of other expenses associated with the mine and accrued interest:

No default shall be deemed to have occurred if the undersigned shall apply all cash received by the undersigned (after payment by the undersigned of all costs incurred to mine, remove and sell coal from the * * * [mine], together with any severance taxes, land owners' and surface owners' royalties, and other costs and expenses, reasonable, necessary and appropriate in order to mine, remove, and sell coal from the * * * [mine]), from coal mined, removed and sold from the undersigned's mining interest in the * * * [mine] in satisfaction of the accrued interest, if any, and the unpaid principal obligation of this Note remaining, from time to time, unpaid.

The note was collateralized by the assignment of a security interest in the mineral lease to Mr. Rowlette.

On December 31, 1976, Mr. Rowlette executed an assignment to GSA Corp. of any interest that he had in the sublease.

Also on December 31, 1976, TCR entered into an agreement with GSA providing that the royalty on the coal sold to Carolina Power & Light under the coal supply contract was to be reduced to the extent of any difference between the actual sales price and $23.50 per ton. The agreement provided that:

In the event the purchase price at any time during the duration of the contract with Carolina Power and Light Company * * * is lower than $23.50 per ton, then and in that event, the Partnership may reduce all payments due under the above-referenced lease wherein L. D. ROWLETTE, is Lessor (as assigned to GSA CORPORATION) * * * to the extent of the payments required thereunder but in any event limited to the difference between the selling price of coal by TENNESSEE COAL RESOURCES, LTD., to Carolina Power and Light Company and $23.50. * * * (This provision may be illustrated as follows: In the event during the month of January, 1977 (or any month or months of the Coal Supply Contract) TENNESSEE COAL RESOURCES, LTD., sells coal to Carolina Power and Light Company pursuant to the attached contract for a purchase price of $21.50, then and in that event all obligations due under the Lease Agreement with L. D. ROWLETTE, as Lessor (as assigned to GSA CORPORATION), and EDWIN TUNICK, as Lessee, shall be reduced during that month by $2.00 per ton for all coal sold and mined for that period.)

Accordingly, the full amount of the royalty would only have to be paid if the coal delivered to Carolina Power & Light was

sold at a price of at least $23.50 per ton. If the coal was sold for a lesser amount, payment on the royalty (and thus on the note) was to be reduced or forgiven entirely.

The coal supply contract provided that Carolina Power & Light Co. would pay a base price of $17.75 for 12,000 BTU quality coal, which price would be adjusted if the coal was of higher or lower quality. In order for coal to be sold at $23.50 per ton under the coal supply contract, the quality of coal would have had to exceed 13,000 BTU. In reality, the coal sold to Carolina Power & Light Co. prior to and during December 1976 was of the following quality:

| Delivery date | BTU quality |
|---|---|
| July 1976 | 11,212 |
| Aug. 1976 | 12,978 |
| Aug. 1976 | 12,768 |
| Sept. 1976 | 11,999 |
| Oct. 1976 | 12,593 |
| Nov. 1976 | 12,631 |
| Dec. 1976 | 12,087 |

The legal opinion attached to the confidential offering memorandum included a cash flow analysis which showed an anticipated cash profit to TCR of $3.49 per ton after payments of all costs including payments of the nonrecourse note to GSA. This assumed a $23.50 per ton sales price (for 13,000 BTU coal), payments to GSA of $1.91 per ton, and mining and other costs of $18.10 per ton. Such other mining costs were calculated as follows:

| | |
|---|---|
| Underlying royalty | $1.40 |
| Contract miner | [7]12.00 |
| Hauling | 1.10 |
| Severance tax | 0.20 |
| Tippling | 0.40 |
| General partner fee | 1.00 |

---

[7]The mining agreement with John Walden that was assigned by GSA Corp. to TCR provided guidelines with respect to the price that would be paid to John Walden as contract miner. The agreement provided that Walden was to receive a base price of $15.50 per ton for 12,000 BTU coal; $16.50 per ton for 12,500 BTU coal; and $18.50 per ton for 13,000 BTU coal (quality sufficient to sell at $23.50 to Carolina Power & Light). These amounts, however, were mere quidelines to be adjusted based upon the coal supply contract with Carolina Power & Light Co.

Legal representation fee ............. $1.00
Administrative expense .............. 1.00

Total ................................. 18.10

According to the terms of the nonrecourse note, repayment would have required 1,500,000 tons of coal to be mined. This amount of coal, multiplied by $1.91 per ton (the amount of the payment to the lessor per ton of coal that was to be offset against the principal of the note), would have yielded sufficient funds ($2,865,000) to repay the note and applicable interest.

With respect to the amount of recoverable coal on the leased property, the partnership received a document prepared by Richard E. Bergenback, a geologist at the University of Tennessee. In compiling his report, Mr. Bergenback relied entirely on information supplied by Mr. Tom Shattuck, owner and operator of Shattuck Coal Co., with respect to the thickness of the coal seam and the quality of the coal. Mr. Bergenback did no independent investigatory drilling to test the correctness of the information upon which he based his report. Mr. Bergenback calculated the amount of available coal by multiplying the size of the property (based on 741 acres, of which 10 acres had been mined) by the estimated tonnage of coal per acre. Mr. Bergenback's calculations were based on the assumptions that the average thickness of the coal seam was 30 inches and that the average acre contained 1,800 tons of coal per acre foot. Accordingly, he concluded that there were 4,500 tons of coal per acre. Based on such assumptions, Mr. Bergenback estimated that the entire property contained a total of 3,289,500 tons of coal (741 acres × 4,500 tons). He went on to calculate the estimated recoverable coal as follows:

If a factor of 50% recovery in deep mining is used, then 1,644,750 tons of Rex Coal may be recovered. If an optimistic recovery factor of 70% is used, then 2,302,650 tons of Rex Coal may be recovered.

In actuality, the property subleased by TCR consisted of only about 630 acres, 10 acres of which already were mined. Furthermore, under the mining plan being used in the mine, it was very unlikely that the percentage of coal that was recoverable would exceed 60 percent.

Prior to the sale of the mine by the Shattuck Coal Co. to L. D. Rowlette, no investigatory or core drilling of the property

was performed. Later core drilling on the property indicated that the coal seam on the property actually varied in thickness from 12 inches to 60 inches. Variations in the coal thickness made it difficult to establish a mining plan and existing technology did not permit efficient mining of coal seams as thin as 12 inches. In fact, among the reasons why the contract miner ceased mining operations in 1980 was that the coal seam quickly reduced in size from more than 60 inches to less than 20 inches, making it impossible to mine marketable coal.

The confidential offering memorandum dated November 12, 1976, by which interests were offered to various limited partners, recognized that there were numerous risks which could jeopardize the profitability of the venture:

### RISK FACTORS

This offer and offerings of many mining investments involve significant risks and should be carefully analyzed by each prospective investor.

1. The economic viability of the Partnership depends upon its being able to obtain a substantial income generated by others who will actually conduct the mining operations on the Coal Properties. An important factor in determining the amount that third parties will be willing to pay will be the market price available on the sale of the coal. In the absence of long term contracts the spot market for coal will govern this market price and at the present time the spot market for the coal is depressed and there can be no assurances that there will be increases in such market price. Therefore, unless the market price for coal increases, profits may not be made by the Partnership and the economic viability of this Partnership is predicated upon the expectation that coal prices will increase. * * *

2. In order to maintain its interest in the Coal Properties, the Partnership must meet a payment schedule of cash minimum royalties. If sufficient capital is not raised to meet these minimum royalty payments or if production and sale of coal is not obtained so that the minimum royalty payments can be met out of earned tonnage royalties, the Partnership could lose its entire interest in the Coal Properties. In addition, if sufficient income is not being generated by mining operations to meet the note payments plus interest to meet the debt service requirements, the Partnership could lose its entire interest in the Coal Properties. (See "NON-RECOURSE NOTE, SECURED PROMISSORY NOTE").

*       *       *       *       *       *       *

4.   * * *

On October 29, 1976, the Internal Revenue Service issued a news release concerning advance royalties under coal and mineral leases. The news release stated that a proposed amendment to the income tax regulations modifying the treatment of advanced royalties under Coal leases will be

published in the near future in the Federal Register. The amendment will affect year of deductability [sic] of advanced royalties. Under the amendment to be proposed, the treatment of advanced royalties will be revised effective October 29, 1976, unless advance royalties are required to be paid pursuant to a mineral lease which was binding prior to October 29, 1976, upon the party, who, in fact, paid or accrued such royalties. The news release futher [sic] announces the suspension of Revenue Rulings 70–20 and 74–214. As a result of the suspension of these rulings, taxpayers may not rely upon the tax treatment provided for therein, after October 29, 1976. The news release further contained a proposed amendment to income tax regulation section 1.612–3(b)(b) [sic]. Pursuant to the proposed regulations and the suspension of the aforementioned Revenue Ruling, there can be no assurances that deductions taken by the partnership herein for the payment of coal mining royalties in advance will be allowed by the Internal Revenue Service. In effect, the regulation, if adopted, as proposed, would deny in magnitude the "up front" deduction for coal and other mineral lease arrangements entered into after October 29, 1976. Each investor should carefully consider this matter and in this connection, each investor is urged to consult his own tax advisor as to the efficacy of the Internal Revenue Service's recent action.

\* \* \* \* \* \* \*

## 9. *Environmental and Pollution Controls*

The Partnership will be subject to increasingly strict Federal and State environmental and pollution controls involving its mining operations. Although not now predictable, such controls could possibly entail large capital expenditures, curtailment of production, increased mining costs and loss of reserves.

\* \* \* \* \* \* \*

## 10. *Weather Interruptions*

The coal operations will be subject to periodic interruptions due to severe weather, mostly in wintertime. \* \* \*

## 11. *Safety Regulation*

The Partnership will be subject to safety regulations relating, among other matters, to the design and use of mining methods and equipment.

\* \* \* \* \* \* \*

## 12. *Transportation*

The Partnership's production could be severely affected by an industry-wide shortage of trucks or railroad cars to transport coal or strikes affecting such transportation methods. \* \* \*

### 13. *Existence of Coal*

Although the Partnership has received professional written judgments and estimates indicating the existence of substantial recoverable coal reserves under the Partnership's property, based upon historical and geological data, field inspection, spot core drilling and other factors, there is no assurance as to the quantities of such coal reserves or the exact amount of reserves which are physically and economically recoverable. It is intended that such professional judgments and estimates will be reconfirmed by the independent mining engineer's report prior to the disbursement of the proceeds of this offering to the Seller.

### 14. *Market Place*

During the past several years the market price of coal has been extremely volatile, rising from a low point in 1973 to a peak in 1974–1975 and having declined since. It is presently anticipated that long-term coal purchase contracts will be sought by the Partnership, however, if these contracts are not forthcoming, the Partnership's coal will be sold at whatever prices are available, from time to time (the "Spot Market"), thereby making the Partnership extremely susceptible to price fluctuations. In this regard, it is intended that a Coal Supply Agreement, shall be assigned to the Partnership as a condition precedent to the closing herein. (See Exhibit E for COAL SUPPLY AGREEMENT to be assigned). In the event that the price at which the Partnership is able to sell its coal is not in excess of the sum of its mining costs, taxes, commissions, royalties, fees, required payments of principal and interest on the Note and other obligations and costs, the Partnership may be unable to meet all of its obligations and the General Partner may determine to stop mining operations. In either event, the Partnership runs the risk that, because of inability to pay the fixed obligations of the Note, the investors may have to forfeit their Units. In such event, the investors may lose their entire investment.

### 15. *Costs of Mining Operations*

Since the cost of mining can fluctuate, the General Partner, may, pursuant to a Mining Contract to be entered into by the Partnership, determine that it would be uneconomical to commence or continue mining activities.

The Partnership will need to sell coal to be removed from the Property at an *average* price of at least $20 per ton in order to have a break-even after tax cash flow. At this price level, the General Partner may elect to defer mining of the coal from the Property.

### 16. *Mining Contract*

The Partnership would be adversely affected by its being unable to obtain a reputable mining contractor charging in excess of $15 per ton. The Partnership also may be adversely affected by variations in the specifica-

tions of the coal which it mines, causing it not to be able to meet the specifications of a particular buyer of its coal.

Additionally, labor, trucking, explosives and other expenses may increase beyond present levels due to inflation, labor problems, union problems, local shortages, the impact of a national energy crisis and other factors. Variations in levels of productivity and the need for additional equipment may also affect costs. In addition, costs may increase as a result of the enactment of laws regulating business activities affecting the environment and/or health and safety. There can be no assurance that the Partnership will be able to market its coal at a profit. In the event that it is unable to cover its costs, the Partnership and the investors may suffer adverse financial consequences, including the loss of their investment.

The General Partner has represented he will be able to obtain the services of a mining contractor who will mine at $15.00 per ton compensation. However, there can be no assurance to the Partnership of finding a mining contractor at that contract price other than the representation of the General Partner.

## 17. *Economic Matters*

The possible imposition of mandatory price controls or allocations of various energy sources, including coal, or other measures could have an adverse effect on the Partnership's operations. It is also possible that a reduction in oil or gas prices may reduce the demand for and the price of coal, thereby making the Partnership's proposed mining activities either less profitable or unprofitable. Since a significant portion of the coal mined in the United States is exported, any adverse economic conditions abroad could have a direct adverse effect on the ability of coal producers, especially smaller entities such as the Partnership, to market its coal. * * *

## 18. *Operating Hazards*

The Partnership will be involved substantially in deep or underground mining. With this type of mining there are significant operating hazards.

\*      \*      \*      \*      \*      \*      \*

## 21. *Mining Experience*

The General Partner has had no experience in the operation of a coal mining business. However, the General Partner has had significant experience in business affairs. The Partnership has agreed to employ the General Partner as a manager for the purpose of supervising the business operations and rendering advice with respect to the marketing of the Partnership's coal. It should be noted that the General Partner has never previously served as a General Partner in a Limited Partnership under these conditions. (See "GENERAL PARTNER").

\*     \*     \*     \*     \*     \*     \*

### 23. *Competition*

The coal industry is highly competitive and the Partnership will be competing with many other domestic coal producers. Most of its competitors have greater financial resources. In recent years, many of the largest United States coal producers have been acquired by companies in other industries, and a number of domestic steel producers and public utilities have acquired control of coal mines. Also, the larger capital outlays that have become necessary to compete effectively have contributed to the closing or sale of many mines. The Partnership's coal will be competing with hydro-electric power and other fuels, principally, oil, natural gas and, to a lesser extent, nuclear power, in the production of electricity and the manufactur [sic] of steel and other metallurgical products.

\*     \*     \*     \*     \*     \*     \*

### 25. *Non-Payment of Non-Recourse Note*

Non-payment of the Non-Recourse Note may result in the forfeiture of the Partnership's interest in the mining lease.

In addition, the opinion of tax counsel that was attached to the offering memorandum recognized the high risk of a challenge to the TCR venture by the IRS. It provided in pertinent part as follows:

The General Partner has advised the undersigned that the Partnership intends to claim the advanced royalty deduction in accordance with current trade practices in the coal industry notwithstanding the Internal Revenue Service Information Release Number 1687, dated October 29, 1976. *The effect of claiming this deduction will almost certainly cause the Internal Revenue Service to challenge the deductibility of the advanced royalty deduction pursuant to the aforementioned information release.* The undersigned law firm, as part of its fee and compensation received in connection with the organization of the Partnership, and the rendering of the within opinion, has agreed to represent the Partnership before the Internal Revenue Service, with regard to any challenge initiated by the Internal Revenue Service with regard to the Partnership tax return and the items of deduction or claims therein. Said representation shall be provided throughout all administrative levels of the Internal Revenue Service without additional fees other than as provided in the offering circular entitled Tennessee Coal Resources, Ltd., dated November 12, 1976. [Emphasis in original.]

TCR encountered many of the problems that were raised as risk factors in the offering memorandum. Among the problems that arose which affected the mining of coal were (1) engineering problems; (2) cold weather that prevented mining for 3 to 4

months in 1977; (3) flooding; (4) undercapitalization of the contract miner; (5) regulations of environmental and mining agencies; (6) depressed coal prices; and (7) a coal seam that became too thin to mine. The actual amounts of coal that were mined by TCR in 1976 and 1977 were zero and 2,827.8 tons, respectively. TCR breached its coal supply agreement with Carolina Power & Light Co. in 1977. No coal was delivered to such utility after May 1977.

In April 1978, Mr. Edwin Tunick was replaced as general partner by Mr. Brent W. Trump. The operation began to turn around under Mr. Trump's guidance, and increased quantities of coal were mined by TCR after his appointment. Nevertheless, TCR abandoned the lease in 1980.

No payments ever were made by TCR on the $2,350,000 nonrecourse note to Mr. Rowlette that had been assigned to GSA.

On its 1976 income tax return, TCR claimed the following expenses:

| | |
|---|---:|
| Legal fees | $100,000 |
| Travel and office | 2,576 |
| Phone | 1,060 |
| Total | 103,636 |

The latter two expenses were incurred by the general partner and reimbursed by TCR on December 31, 1976. Respondent, in the statutory notices in these cases, disallowed such expenses on the basis that it has not been established that they represented ordinary and necessary business expenses or were expended for the purpose designated.

On its 1977 return, TCR reported gross income from sales of coal in the amount of $85,393. Respondent determined that such gross income was $122,331, and increased the partnership's gross income accordingly by $36,938.

TCR, on its 1977 return, also claimed $20,207 as amortization of organizational expenses. In 1976, TCR disbursed $88,500 to the general partner for organizational expense and paid $1,035 as a filing fee to the State of Florida. Respondent, in the statutory notices, determined that the full amount of $20,207 claimed as an amortization expense was not allowable for failure to establish that the amounts claimed represented

organizational expenses which may be amortized in accordance with section 709.

Respondent also disallowed $37,596 of other expenses claimed by TCR on its 1977 return on the basis that TCR had not established that such amounts represented ordinary and necessary business expenses or were expended for the purposes designated. The specific deductions with the amounts claimed, the amounts allowed by respondent, and disallowed by respondent are as follows:

| Item | Claimed | Allowed | Disallowed |
|---|---|---|---|
| Interest | $1,824 | $807 | $1,017 |
| Taxes | 74 | 0 | 74 |
| Repairs | 97 | 0 | 97 |
| Contract miner/ cost of sales | 84,406 | 62,828 | 21,578 |
| Tipple fees | 7,009 | 2,656 | 4,353 |
| Security expense | 1,676 | 0 | 1,676 |
| Casual labor | 5 | 0 | 5 |
| Supplies | 1,080 | 0 | 1,080 |
| Telephone | 2,903 | 0 | 2,903 |
| Insurance | 1,833 | 0 | 1,833 |
| Utilities | 496 | 0 | 496 |
| Auto and travel | 2,125 | 0 | 2,125 |
| Bank charges | 65 | 0 | 65 |
| Dues and subscriptions | 98 | 0 | 98 |
| Uniforms | 37 | 0 | 37 |
| Office expense | 157 | 0 | 157 |

Petitioners Brent W. and Cheryl A. Trump, on their 1976 income tax return, claimed a miscellaneous deduction in the amount of $1,010 for unreimbursed travel and promotional expenses. Respondent disallowed $678 of that deduction on the basis that the petitioners had not established that amounts in excess of $322 constituted ordinary and necessary business expenses, were expended for the purposes designated, or met the requirements for the deduction set forth in section 274. On their 1977 income tax return, the Trumps claimed a deduction in the amount of $1,238 for travel and entertainment expenses. Respondent disallowed $836 of that deduction on the basis that the petitioners had not established that amounts in excess of $402 constituted ordinary and necessary business

expenses, were expended for the purpose designated, or met the requirements for the deduction set forth in section 274.

Petitioners Wilbur F. and Patricia Helmus claimed on their 1976 income tax return a deduction of $5,192 for employee business expenses. Respondent disallowed $1,341 of that deduction on the basis that the petitioners had not established that amounts in excess of $3,851 were ordinary and necessary business expenses or were expended for the purposes designated. The Helmuses claimed on their 1977 income tax return a deduction of $7,064 for employee business expenses. Respondent disallowed $2,556 of that deduction on the basis that the petitioners had not established that amounts in excess of $4,508 constituted ordinary and necessary business expenses or were expended for the purposes designated.

Petitioner Russell L. Redhouse, Jr., on his 1976 income tax return, reported $2,043.09 income from dividends and claimed a $200 exclusion thereby having added to other income the amount of $1,843.09.[8] Respondent determined that this income was in fact interest income and that, therefore, the $200 exclusion was not allowable. Respondent also determined that the actual interest income was in the amount of $2,053.69 rather than the $2,043.09 reported. Therefore, respondent determined that income for the year 1976 was increased in the amount of $210.60.

Also on his 1976 income tax return, Mr. Redhouse claimed a deduction in the amount of $740 for employee business expenses. Respondent disallowed $553.25 of that deduction on the basis that the petitioners had not established that amounts in excess of $186.75 were allowable under section 274.

OPINION

To outline briefly the salient facts, TCR was formed on December 30, 1976, after petitioners and others agreed to subscribe for limited partnership interests therein. One day later, TCR acquired an ongoing coal mine. The specific assets acquired comprised: a sublease that included rights to mine

---

[8]The parties stipulated that petitioner Mr. Redhouse reported dividend income of $2,043.09 and claimed a $200 exclusion, resulting in taxable dividend income of $843.09. However, his 1976 income tax return indicates that he accurately reported $1,843.09 of taxable dividend income, and we so find.

coal and to use a tipple; a coal supply agreement with Carolina Power & Light; an operating agreement with Mr. John T. Walden; and a note receivable and a security interest on the sale of mining equipment. In payment for the coal mine, TCR transferred $650,000 cash and gave a nonrecourse note for $2,350,000. TCR characterized the entire amount as an advanced royalty and claimed an advanced royalty deduction in the amount of $3 million on its 1976 return.

Respondent disallowed the entire deduction under section 1.612–3(b)(3), Income Tax Regs., as amended by T.D. 7523, 1978–1 C.B. 192,[9] because no coal was mined in 1976. It is respondent's position that, under the regulation as amended, an advanced lump-sum royalty may be deducted only upon the sale of the coal with respect to which it is paid. Petitioners counter with the argument that the amended version of section 1.612–3(b)(3), Income Tax Regs., is invalid because (1) the Internal Revenue Service failed to comply with the requirements of the Administrative Procedure Act (APA) in promulgating the regulation, and (2) the legislative reenactment doctrine mandates that the prior regulation is the proper interpretation of the Code.

The parties agree on the following relevant facts with respect to the amendment of the regulation at issue. On October 29, 1976, the Internal Revenue Service issued a news release in which it announced that proposed regulations under section 612, that would modify the treatment of advanced

---

[9]Sec. 1.612–3(b)(3), Income Tax Regs., as amended, provides in part as follows:

Sec. 1.612–3. Depletion; treatment of bonus and advanced royalty.

(b) *Advanced royalties.* * * *

\*     \*     \*     \*     \*     \*     \*

(3) The payor shall treat the advanced royalties paid or accrued in connection with mineral property as deductions from gross income for the year the mineral product, in respect of which the advanced royalties were paid or accrued, is sold. For purposes of the preceding sentence, in the case of mineral sold before production the mineral product is considered to be sold when the mineral is produced (*i.e.*, when a mineral product first exists). However, in the case of advanced mineral royalties paid or accrued in connection with mineral property as a result of a minimum royalty provision, the payor, at his option, may instead treat the advanced royalties as deductions from gross income for the year in which the advanced royalties are paid or accrued. See section 446 (relating to general rule for methods of accounting) and the regulations thereunder. For purposes of this paragraph, a minimum royalty provision requires that a substantially uniform amount of royalties be paid at least annually either over the life of the lease or for a period of at least 20 years, in the absence of mineral production requiring payment of aggregate royalties in a greater amount. * * *

royalties under mineral leases as of October 29, 1976, would be published in the Federal Register during the following week. News Release IR–1687, Oct. 29, 1976. Under the proposed regulations, a copy of which was attached to the press release, lump-sum advanced royalties could be deducted only in the year of sale of the mineral product with respect to which the royalty is paid. The news release also announced that it was suspending Rev. Rul. 70–20, 1970–1 C.B. 144, and Rev. Rul. 74–214, 1974–1 C.B. 148, wherein the Service had concluded that lump-sum royalties were deductible when paid or accrued. On November 2, 1976, a notice of proposed rulemaking, containing the proposed regulation that had been attached to the News Release IR–1687, was published in the Federal Register along with an announcement that public hearings would be held on November 30, 1976. In the November 15, 1976, issue of the Internal Revenue Bulletin, the Service announced that an amendment to section 1.612–3(b)(3), Income Tax Regs., was proposed, that hearings would be held on November 30, 1976, and that the last date for the submission of comment was November 23, 1976. Some 13 months later, on December 19, 1977, T.D. 7523, 1978–1 C.B. 192, was published in the Federal Register (42 Fed. Reg. 63640). The final version of the regulation was substantially the same as that published in News Release IR–1687 and in the Federal Register notice of November 2, 1976,[10] and was to be applied retroactively to October 29, 1976. Also on December 19, 1977, Rev. Rul. 77–489, 1977–2 C.B. 177, announced the revocation of Rev. Rul. 70–20 and Rev. Rul. 74–214.

The first issue raised by petitioners for our consideration is whether, in amending section 1.612–3(b)(3), Income Tax Regs., respondent complied with the procedural requirements of the Administrative Procedure Act (APA) and the requirements in the regulations of the Internal Revenue Code with respect to proposed rulemaking. In addition, we must determine whether the Commissioner abused his discretion in selecting an effective date for the new regulation that made the new regulation retroactive in its application.

Petitioners argue that, in promulgating regulations, the IRS

---

[10]Minor changes in the content of the regulation between the proposed and final drafts are not relevant here.

is bound by the provisions of the Administrative Procedures Act, 5 U.S.C. sec. 551 et seq.,[11] including the requirements of 5 U.S.C. sec. 552(a)(1) concerning publication in the Federal Register of substantive rules of general applicability. As such, petitioners argue that the provisions of 5 U.S.C. sec. 553(d),[12] requiring publication of a substantive rule at least 30 days before its effective date, apply to the IRS and were not complied with in the process of amending section 1.612–3(b)(3), Income Tax Regs.

Respondent admits that the 30-day rule of 5 U.S.C. sec. 553(d) generally is applicable to the Internal Revenue Service. However, respondent argues that to give the provision the literal meaning attributed to it by petitioners would render section 7805(b), which authorizes the Secretary to prescribe the extent, if any, to which any regulation shall be applied without retroactive effect, meaningless. Section 7805 provides:

SEC. 7805. RULES AND REGULATIONS.

(a) AUTHORIZATION.—Except where such authority is expressly given by this title to any person other than an officer or employee of the Treasury Department, the Secretary or his delegate shall prescribe all needful rules and regulations for the enforcement of this title, including all rules and regulations as may be necessary by reason of any alteration of law in relation to internal revenue.

(b) RETROACTIVITY OF REGULATIONS OR RULINGS.—The Secretary or his delegate may prescribe the extent, if any, to which any ruling or regulation, relating to the internal revenue laws, shall be applied without retroactive effect.

Thus, a seeming conflict is created between the Secretary's power to promulgate retroactive regulations and the APA's requirement of 30 days' advance notice before regulations take effect.

Neither the legislative history of 5 U.S.C. sec. 553(d) nor the history of section 7805(b) resolves this apparent conflict. The history of section 7805(b), however, is illuminating in that it

---

[11]See sec. 601.601(a)(2), Statement of Procedural Rules.

[12]5 U.S.C. sec. 553(d) provides as follows:

(d)  The required publication or service of a substantive rule shall be made not less than 30 days before its effective date, except—

(1)  a substantive rule which grants or recognizes an exception or relieves a restriction;

(2)  interpretative rules and statements of policy; or

(3)  as otherwise provided by the agency for good cause found and published with the rule.

reveals that the section originally was conceived as a way to permit the Secretary of the Treasury to assist taxpayers who were adversely affected by subsequent changes in the regulations. In other words, section 7805(b) was intended to be a taxpayer-relief provision by granting the Internal Revenue Service power to avoid inequitable results by applying its regulations and rulings with prospective effect only. As such, retroactive effect was presumed, and prospective application could only be achieved by specific provision. See H. Rept. 350, 67th Cong., 1st Sess. (1921), 1939–1 C.B. (Part 2) 168; S. Rept. 275, 67th Cong., 1st Sess. (1921), 1939–1 C.B. (Part 2) 181. See also H. Rept. 704, 73d Cong., 2d Sess. (1934), 1939–1 C.B. (Part 2) 554, 583 ("in some cases the application of regulations, Treasury decisions, and rulings to past transactions which have been closed by taxpayers in reliance upon existing practice, will work such inequitable results that it is believed desirable to lodge in the Treasury Department the power to avoid these results by applying certain regulations, Treasury decisions, and rulings with prospective effect only").

The legislative history of the APA reveals that the purpose of the 30-day rule of 5 U.S.C. sec. 553(d) was to afford affected persons a reasonable time to prepare for final effectiveness of a rule or to take any action which the issuance of the rule may require. S. Rept. 752, to accompany S. 7 (Pub. L. 404), 79th Cong., 1st Sess. (1945), reprinted in S. Rept. 248, 79th Cong., 2d Sess. 200 (1946); H. Rept. 1980, to accompany S. 7 (Pub. L. 404), 79th Cong., 2d Sess. (1946), reprinted in S. Rept. 248, 79th Cong., 2d Sess. 259 (1946). See also *United States v. Gavrilovic*, 551 F.2d 1099, 1104 n. 9 (8th Cir. 1977). This is to be contrasted with the purposes behind 5 U.S.C. sec. 553(b). The notice requirements of 5 U.S.C. sec. 553(b) provide an opportunity for interested persons to comment on proposed rules and for the agency promulgating the rule to educate itself before making the rule final. See *Texaco v. Federal Power Commission*, 412 F.2d 740, 744 (3d Cir. 1969).[13]

We are of the opinion that section 7805(b) sets out a blanket rule which specifically permits the Commissioner to prescribe prospective effect to regulations which would otherwise have

---

[13]See also *National Labor Relations Board v. Wyman-Gordon Co.*, 394 U.S. 759, 764 (1969).

retroactive application. See *Dixon v. United States*, 381 U.S. 68, 71 (1965); *Automobile Club of Michigan v. Commissioner*, 353 U.S. 180, 184 (1957); *United States v. California Portland Cement Co.*, 413 F.2d 161, 164 (9th Cir. 1969); *Pollack v. Commissioner*, 392 F.2d 409, 411 (5th Cir. 1968). Furthermore, we believe that section 7805(b) does not conflict with the purposes behind 5 U.S.C. sec. 553(d), that the conflict is more apparent than real in the context of the facts before us.

In the instant case, respondent published the notice of proposed rulemaking in the Federal Register on November 2, 1976, in accordance with 5 U.S.C. sec. 553(b). Comments were solicited, and a hearing was scheduled for November 30, 1976. All concerned parties were informed of the intent to make the regulation retroactive to October 29, 1976. During the approximately 13-month lapse between publication and effectiveness, the IRS acted on the advice gathered in the comments and hearing and made minor changes in the text of the proposed regulation. Affected parties, knowing of the intended retroactivity, had the opportunity to prepare for the final publication of the rule. Therefore, we are satisfied that the purposes behind 5 U.S.C. sec. 553(d) were fulfilled.[14]

Furthermore, we do not believe that making the new regulation retroactive to October 29, 1976, was an unreasonable exercise of the Commissioner's powers under section 7805. This case is not one in which taxpayers acted in accordance with a regulation of the IRS, and the regulation subsequently was changed to call their prior actions into question. Here, affected parties were on notice as of October 29, 1976, of the IRS's intention to amend the regulation with respect to the deductibility of advanced royalty payments.[15] In fact, both the opinion of tax counsel and the "risk factors" section of the offering memorandum for TCR establish that the promoters

---

[14]Mere technical violations of the APA will not be considered cause to invalidate a regulation. *Nader v. Sawhill*, 514 F.2d 1064 (D.C. Cir. 1975); *Gulf Oil Corp. v. Hickel*, 435 F.2d 440 (D.C. Cir. 1970).

[15]We need not, and do not, determine whether News Release IR–1687 of Oct. 29, 1976, constituted adequate notice of a proposed change such that retroactivity to that date was reasonable. Suffice it to say that the notice of proposed rulemaking, which clearly constituted adequate notice, was published in the Federal Register on Nov. 2, 1976, almost 8 weeks prior to the formation of the partnership and the transfer of the payments in question herein.

and investors had actual notice of the fact that the IRS had issued a proposed regulation and were on notice of the intent of the Service to apply the new regulation retroactively. The petitioners herein entered into the transaction with full knowledge that the venture would likely be questioned by the Internal Revenue Service. Accordingly, our sympathy is minimal for petitioners' argument that the Commissioner acted unreasonably and that they were adversely affected by the retroactivity of the new regulation.

Second, petitioners contend that the regulation as amended is invalid because the old regulation was tacitly approved by Congress pursuant to the so-called legislative reenactment doctrine. See generally *Helvering v. R. J. Reynolds Tobacco Co.*, 306 U.S. 110 (1939). Under such doctrine, "Treasury regulations and interpretations long continued without substantial change, applying to unamended or substantially reenacted statutes, are deemed to have received congressional approval and have the effect of law." *Helvering v. Winmill*, 305 U.S. 79, 83 (1938). Petitioners argue that the old regulation had been in effect since 1960 during which time Congress enacted numerous amendments to the Code including a number of changes to the sections concerning depletion. They note that Congress failed to make any changes which affected the regulations under section 612. Further, petitioners claim that they acted in accordance with the interpretation of the old regulation that was embodied in Rev. Rul. 70–20 and Rev. Rul. 74–214.

Respondent answers by denying that the legislative reenactment doctrine applies in the instant case. First, respondent claims that the last congressional action with respect to section 612 occurred in 1954, yet the interpretation of the old regulation, section 1.612–3(b)(3), Income Tax Regs., that permitted the current deduction of advanced lump-sum royalty payments was not enunciated until 1970. See Rev. Rul. 70–20, 1970–1 C.B. 144. As no affirmative congressional reenactment of section 612 has been undertaken since 1970, he argues that the doctrine cannot apply. Alternatively, even if the legislative reenactment doctrine is found to apply, respondent argues that the old regulation did not permit a deduction for any

advanced royalties other than minimum annual royalty payments and that revenue rulings to the contrary[16] were incorrect interpretations of the old regulation.[17] As such, the amendment to the regulation merely constituted a clarification of the prior regulation.

We begin by pointing out that the respondent's revenue rulings are not binding on this Court. In addition, respondent has the power to amend or withdraw a revenue ruling if it is contrary to law. *Automobile Club of Michigan v. Commissioner*, 353 U.S. 180, 184 (1957). See also *Dixon v. United States*, 381 U.S. 68, 75 (1965). Therefore, the revocation of Rev. Rul. 70–20 and Rev. Rul. 74–214 by the publication on December 19, 1977, of Rev. Rul. 77–489, 1977–2 C.B. 177, was well within the power of respondent. As such, we do not believe that the legislative reenactment doctrine can be applied to bar reasonable amendments to regulations where, as here, the change is made only prospectively from the date of the announcement of the proposed change. See *Helvering v. R. J. Reynolds Tobacco Co.*, 306 U.S. at 116, wherein the Supreme Court applied the doctrine to invalidate a regulation where such regulation was to apply retroactively to periods prior to its promulgation.

Furthermore, as we noted *supra*, the fact that petitioners were aware at the time they entered into the TCR venture of respondent's intent to revoke the revenue rulings makes us unwilling to give any credence to the argument that petitioners acted in reliance on the interpretation of the old regulation embodied in the revenue rulings. See *Manocchio v. Commissioner*, 78 T.C. 989 (1982). In fact, the situation smacks more of

[16]See Rev. Rul. 74–214, 1974–1 C.B. 148 (lump-sum payment made to lessor in advance of mining and subject to recoupment at a specified rate per ton against coal mined in future is an advanced royalty under sec. 1.612–3(b), Income Tax Regs.); Rev. Rul. 70–20, 1970–1 C.B. 144 (lump-sum payments made to lessor at beginning of each of first 9 years of a mineral lease and which are recoupable out of royalties based on production over the life of the lease were advanced royalties under sec. 1.612–3(b)(3), Income Tax Regs.).

[17]Respondent points out that the language of sec. 1.612–3(b)(1), Income Tax Regs., refers to royalties paid by the owner of an operating interest in a mineral deposit "on a specified number of units of such mineral * * * annually whether or not extracted." The language of sec. 1.612–3(b)(3), Income Tax Regs., prior to its amendment referred to the treatment by the payor of advanced royalties "so paid or accrued." It is alleged that the "so paid or accrued" language referred to the type of minimum annual royalty denoted in sec. 1.612–3(b)(1), Income Tax Regs., and specifically referred to in the example in sec. 1.612–3(b)(4), Income Tax Regs. See also *Commissioner v. Jamison Coal & Coke Co.*, 67 F.2d 342 (3d Cir. 1933); *Burnet v. Hutchinson Coal Co.*, 64 F.2d 275 (4th Cir. 1933); T.D. 4960, 1940–1 C.B. 38.

petitioners rushing in to take advantage of respondent before he can finalize his amendment to the regulations.

In addition, we cannot accept the notion that Congress, by its inaction, "legislatively reenacted" the old regulation. Section 612 was incorporated into the 1954 Code, and section 1.612–3(b)(3), Income Tax Regs., initially was promulgated in 1960. T.D. 6446, 1960–1 C.B. 208, 227. The interpretation that such regulation was applicable to advanced lump-sum royalties was not forthcoming until 1970. See Rev. Rul. 70–20, 1970–1 C.B. 144. Clearly, Congress could not have been aware of the regulation until it came into being in 1960, and of the interpretation here in issue until 1970. As section 612 was not amended during this period, and Congress never even undertook an examination of the regulation or the interpretation thereof espoused in the 1970 revenue ruling, we cannot agree that the legislative reenactment doctrine is applicable.

Finally, even if the legislative reenactment doctrine were to apply, we believe that it is not unreasonable to read the old regulation as applying only to advanced minimum annual royalty payments and not to the advanced lump-sum royalties here in issue. Accordingly, respondent properly revoked the two revenue rulings that extended the coverage of the old regulation to the payment of advanced lump-sum royalties and clarified the regulation by his amendments that are embodied in the new regulation. We hold for respondent.

Next, we turn to the second issue raised by the parties: whether the advanced royalty deduction allowable to TCR should be limited to the amount of cash paid by the partnership. Petitioners claim that the nonrecourse note should be treated as an advanced royalty payment and that it should be treated as having economic reality because there was a reasonable expectation that it would be satisfied. To support their claims, they argue that there were sufficient coal reserves and sufficient projected profit per ton of coal to be mined to satisfy the note. Respondent, on the other hand, asserts that any advanced royalty deduction that is permitted to petitioners should be limited to the amount of cash paid because the nonrecourse note is contingent and otherwise lacks economic substance. He alleges that the facts show (1) that payment on the note neither was contemplated by the parties nor was possible considering the projected earnings

and expenses from the mine; (2) that the payment actually was not intended to be for advanced royalty; (3) that there were not sufficient coal reserves to satisfy the note; (4) that the extremely high degree of risk in the venture made payment on the note improbable; (5) that subsequent events confirm the highly contingent nature of the note; and (6) that nonrecourse notes generally are not used in the coal industry.

We have already held that section 1.612–3(b)(3), Income Tax Regs., as amended, is valid; therefore, advanced royalties are deductible in the year of sale that the mineral with respect to which the advanced royalty is paid or accrued is sold. In the case of minerals sold before production, the mineral product is considered to be sold at the time it is produced. The parties have stipulated that no coal was mined in 1976 and that 2,827.8 tons of coal were mined in 1977. As the cash transferred was more than the amount of royalty due on the coal mined and sold in 1977, we need not determine whether the transfer of nonrecourse notes constituted payment of advanced royalty. Suffice it to say that we are convinced that the royalties due on coal actually mined or sold in 1977 did not exceed the portion of the cash paid that was allocable to royalties.[18] Hence, petitioners are entitled to a deduction for said amount.

The third issue presented for our consideration is whether petitioners' partnership bases should include their respective shares of the nonrecourse note. As before, we decline the invitation to address this issue because it is unnecessary to our adjudication of the deficiencies before us. According to section 722, a partner's basis includes the amount of money and adjusted basis of property contributed to the partnership. Section 752(a) treats any increase in a partner's share of partnership liabilities as a constructive contribution to the partnership by that partner, thereby increasing his basis

---

[18]Respondent argued on brief that the nonrecourse note should be disregarded, the cash should be allocated to each of the assets acquired in the transaction, and the advance royalty payment should be limited to the remainder of the cash transferred. We agree with respondent that a package of valuable assets was acquired, including mining rights, rights to use a tipple, coal supply agreement, an operating agreement, a note receivable on the sale of equipment, and an ongoing mining operation. However, we believe that a portion of the payment was for payment of advanced royalties. As we are convinced that the amount paid for advanced royalties exceeded the amount of royalty deduction to which petitioners are entitled for 1977, we need not determine the precise allocation.

accordingly. Sec. 1.752–1(e), Income Tax Regs. The evidence indicates that each of the petitioners contributed cash in excess of the amount of partnership deductions that we have determined to be properly allowable. Accordingly, we need not determine whether their bases include their pro rata shares of the nonrecourse note paid by the partnership. See sec. 752(a); sec. 1.752–1(e), Income Tax Regs.

The fourth issue is whether petitioners may deduct in 1976 their pro rata portions of the amount paid by TCR as a legal expense. Petitioners claim that the partnership paid $100,000 to the law firm of DiGuilian, Spellacy, Bernstein, Lyons & Sanders in 1976 and that they are entitled to deduct such payment as a legal fee incurred as an ordinary and necessary business expense. Respondent disallowed the deduction, claiming that the amount was an organizational expense and therefore must be capitalized.[19]

The Tax Reform Act of 1976 added section 709 to the Code which disallows any current deduction for fees paid in connection with the organization and syndication of a partnership. The legislative history to that section makes clear that, for taxable years beginning after December 31, 1975, such fees are to be capitalized in accordance with the rules of law set forth in Rev. Rul. 75–214, 1975–1 C.B. 185, and *Cagle v. Commissioner*, 63 T.C. 86 (1974), affd. 539 F.2d 409 (5th Cir. 1976). The committee reports also emphasize that partnerships are to be treated like other types of taxpayers for the purpose of characterizing expenditures as capital expenditures or deductible items. See H. Rept. 94–658 (1975), 1976–3 C.B. (Vol. 2) 695, 813; S. Rept. 94–938 (1976), 1976–3 C.B. (Vol. 3) 49, 93–94; H. Rept. 94–1515, to accompany H.R. 10612 (Pub. L. 94–455), 94th Cong., 2d Sess. 421 (1976). See also *Kimmelman v. Commissioner*, 72 T.C. 294, 304 (1979). Accordingly, the same treatment afforded to other taxpayers under section 263 is to

---

[19]In 1976, when the disputed expense was incurred, organization and syndication expenses were required to be capitalized. See sec. 709(a) (effective for taxable years beginning after Dec. 31, 1975). Sec. 709(b), which permits the amortization of partnership organizational expenses over a 60-month period, applies only to taxable years beginning after Dec. 31, 1976. Thus, if we hold for respondent, the amortization provisions of sec. 709(b) will not be available to petitioners. Sec. 213(f) (1), (3), Tax Reform Act of 1976, 90 Stat. 1548–1549. See also S. Rept. 94–938 (1976), 1976–3 C.B. (Vol. 3) 49, 94–95.

be accorded to partnerships under section 709(a). See secs. 1.263(a)–2 and 1.263(a)–3, Income Tax Regs.[20]

In the instant case, petitioners claimed a deduction in 1976 for $100,000 for legal expenses.[21] Petitioners have the burden of proving that the fee accrued by the partnership was currently deductible. Rule 142(a), Tax Court Rules of Practice and Procedure; *Welch v. Helvering*, 290 U.S. 111 (1933). To the extent that the legal fees relate to organizational or selling expenses of the partnership, they are not currently deductible. Secs. 263, 709(a).[22] In determining whether such fees were an ordinary and necessary business expense or a capital expenditure, we must look to the nature of the services performed by Mr. Bernstein and the law firm.[23]

The evidence presented in this case does not show precisely what services were performed by the law firm in exchange for the fee. What is clear is that the firm performed all of the legal work involved in preparing the documentation for the partnership, including drafting the offering memorandum and the tax opinion. Thus, we are convinced that some portion of the fee was for legal services. As we are also convinced that Congress intended section 709 to parallel the treatment provided for organizational expenses in sections 263 and 248, we find that

---

[20]The legislative history also reveals that the provision in sec. 709(b) for amortization of organizational expenses incurred in taxable years beginning after Dec. 31, 1976, was intended to parallel the election available under sec. 248 for amortization of organizational expenditures of a corporation.

[21]Petitioners have not submitted any proof that they actually paid the amount claimed as a deduction for legal expenses in 1976. The only indication that there existed any obligation to pay was the statement in the offering memorandum that payment of a $100,000 "fee to attorneys for organization, structure and tax opinion to the partnership" was expected to be made. However, respondent does not deny that the $100,000 properly was accrued by the accrual basis partnership. He only claims that such amount should have been capitalized. We therefore consider respondent to have conceded the fact that the payment properly was accrued, and we proceed to a consideration of the characterization of the expense as a capital or a currently deductible item.

[22]See also *Bush Terminal Buildings Co. v. Commissioner*, 7 T.C. 793, 819 (1946); *Wolkowitz v. Commissioner*, a Memorandum Opinion of this Court dated Aug. 25, 1949.

[23]The evidence shows that Mr. Bernstein, in conjunction with Mr. Edwin Tunick, developed the idea of forming TCR. Mr. Bernstein knew of a number of potential mines for TCR's acquisition and traveled with Mr. Tunick to look at the mines and their assets. For these services, the offering memorandum provided that Mr. Bernstein's law firm was to receive $1 per ton of coal mined in lieu of any finder's fee. Thus, we believe that the $100,000 fee was not intended to be payment for services which were so otherwise compensated.

the portion of the fee attributable to legal advice must be capitalized.[24]

The remaining portion of the fee was for tax advice, for which petitioners arguably may be entitled to a deduction under section 212(3). However, petitioners have not provided us with any evidence to support an allocation of the fee between the legal work and the tax work performed for the partnership. Therefore, in light of petitioners' total failure to prove what portion, if any, of the fee is deductible, we hold for respondent and conclude that the entire amount must be capitalized. See *Wildman v. Commissioner*, 78 T.C. 943 (1982). In doing so, we express no opinion here as to whether fees, that are paid by a partnership and are expressly designated and proved as having been paid for tax advice, are deductible under section 212(3). We note only that the $100,000 fee here at issue was for a wide range of legal work that was integral to the formation of the partnership and its ability to obtain investors. As we have been presented no evidence to ascertain whether any amount was attributable to tax advice aside from the partnership formation advice, we need not reach the issue of whether section 709 overrides section 212(3) with respect to any portion of the fee paid for tax advice.

Finally with respect to the miscellaneous issues raised by respondent relative to the 1976 and 1977 tax returns of TCR and certain individual petitioners, the burden of proof is on petitioners to prove the amount of their income and their entitlement to the claimed deductions. *Welch v. Helvering*, 290 U.S. 111 (1933). Petitioners neither presented any evidence at trial with respect to these miscellaneous adjustments nor argued the propriety of their reporting positions on brief. The only reference to the miscellaneous issues was a statement that they should be considered separately from the issues presented at trial. We hold that the issues were properly

---

[24]The IRS has issued Proposed Regs. sec. 1.709–2(a), (b) wherein organizational expenses are defined specifically to include "Legal fees for services incident to organization of the partnership, such as negotiation and preparation of a partnership agreement," and syndication expenses include "expenses connected with the issuing and marketing of interests in the partnership," such as "legal fees of the underwriter or placement agent and the issuer * * * for securities advice and for tax advice pertaining to the adequacy of tax disclosures in the prospectus or placement memorandum; accounting fees for preparation of representations to be included in the offering materials."

We voice no opinion with respect to the validity of such regulations.

raised by respondent and that petitioners have failed to carry their burden of proof.

In light of the foregoing,

*Decisions will be entered under Rule 155.*